[Civ. No. 24046. Second Dist., Div. One. Dec. 29, 1959.]

CAYETANO J. APABLASA, Appellant, v. MERRITT & COMPANY (a Corporation) et al., Respondents.

Thomas W. Hughes for Appellant.

William J. Cusack for Respondents.

LILLIE, J.—Plaintiff's action for damages for breach of contract is predicated on a written contract entered into September 20, 1955. Hearing the case without a jury, the trial judge directed that the issue of the existence of the contract first be tried; and at the close of plaintiff's case entered a judgment of nonsuit decreeing that no written contract was entered into, existing, or was ever executed.

Part of the correspondence signed by defendant M. C. Selleck appears on the letterhead of defendant Merritt and Company, and although the issue concerning who is bound by the letters is still· pending, for convenience we use the term "defendants" in our review of the evidence.

Contending that the record discloses the formation of a contract based upon a series of correspondence passing between the parties, appellant argues that respondents, by letter dated August 24, 1955 (Ex. 1-A) made an offer which he accepted by letter of September 20, 1955 (Ex. 1-D), later consented to and approved by respondents; and that no formal contract was necessary to bind the parties. As a further claim for reversal he contends that proof of respondents' conduct recognizing the existence of the contract was improperly refused by the trial court.

As we are bound to do on an appeal from a judgment of nonsuit, we view the evidence as favorably as possible to appellant, disregarding all inconsistencies and drawing therefrom all inferences which can reasonably be drawn in his favor (*Solon* v. *Lichtenstein,* 39 Cal.2d 75 [244 P.2d 907] ; *Golceff* v. *Sugarman,* 36 Cal.2d 152 [222 P.2d 665] ) ; and construe the evidence as strongly as possible against the judgment (*Vermont etc. Co.* v. *Declez etc. Co.,* 135 Cal. 579 [67 P. 1057, 87 Am.St.Rep. 134, 56 L.R.A. 728]). However, applying these rules and interpreting the letters relied upon most favorably to appellant (*Sunset Milling etc. Co.* v. *Ander-*

*son,* 39 Cal.2d 773 [249 P.2d 24]; *Mangini* v. *Wolfschmidt, Ltd.,* 165 Cal.App.2d 192 [331 P.2d 728]; *Union Oil Co.* v. *Union Sugar Co.,* 31 Cal.2d 300 [188 P.2d 470]), we conclude that no reasonable construction of the evidence will admit a binding contract between the parties; and that the correspondence amounts to nothing more than preliminary written discussions of various plans directed toward evolving a practical program to produce, merchandise and market plaintiff's invention, the terms of which the parties contemplated subsequently working out and eventually reducing to writing. Appellant's brief is replete with ponderous citations on numerous elementary phases of contract law with none of which we disagree; however, applying them to the situation at bar, even as urged by appellant, we find our conclusion to be the same.

The genesis of the controversy is found in a series of letters growing out of defendants' interest in a device invented by plaintiff. On August 24, 1955, the first letter (Ex. 1-A) was written by defendants to plaintiff:

"I wish to thank you very much for the courtesy and time extended to me in your office yesterday.

"I think you have a very fine invention. Undoubtedly with the right design worked out for the various models, proper sales brochures, and a concentrated direct-sales effort, the returns should be most gratifying. I feel confident that 50,000 units at $50.00 each could be sold within the first year. With the other gold-using industries such as refineries and jewelry manufacturers, the possibilities should be even better.

"For us to work out the proper sales program and devote ourselves one hundred per cent to the adaptability and perfection of various designs is, in itself, going to involve a great deal of time and money. I feel if the enterprise is going to be a success we should use all the money we have to develop and market the product, and pay you your fee out of the operating profits.

"Should you decide to give us a try in merchandising and marketing the item, instead of the $50,000 cash you mentioned as your selling price, I should suggest $100,000 as a bonus payment to be paid from a fixed percentage of the earnings, and when this has been paid, that you should receive a continuing graduated percentage of the profits thereafter. In this way the product would pay its way out for all concerned and would give you a much greater return as well as a permanent income.

"Trusting something like this would be acceptable to you, and looking forward to hearing from you quite soon, I am

Sincerely yours,"

"P.S.: As suggested percentage: 20% of the net until you have received $100,00(0), then 10% of the net thereafter. To protect you, we could agree that in the event your 20% earned less than $5000 in any operating year, you could elect to call for a new deal."

It is this letter appellant claims constituted the offer—"to take over the device under a joint adventure, partnership or licensing arrangement with plaintiff, to manufacture, or have manufactured for them . . . and to sell it" at $50 each; and which was later accepted by him.

An analysis of the writing fails to disclose the definitive terms necessary to constitute it an offer—to manufacture or have manufactured, merchandise and market plaintiff's invention—for an offer must be certain and definite, that the resulting contract may be enforceable (*Chas. Brown & Sons* v. *White Lunch Co.*, 92 Cal.App. 457 [268 P. 490]; *Van Slyke* v. *Broadway Ins. Co.*, 115 Cal. 644 [47 P. 689, 928]; *Goehring* v. *Stockton Morris Plan Co.*, 93 Cal.App.2d 417 [209 P.2d 41]; *Dickey* v. *Pattison*, 92 Cal.App.2d 659 [207 P.2d 1081]).

█ It is well settled that if the offer is so indefinite as to make it impossible for a court to decide just what it means, and to fix exactly the legal liability of the parties, its acceptance cannot result in an enforceable agreement. █ The letter, a definite rejection by defendants of the idea of an outright sale of the device and an invitation to consider their services in merchandising and marketing the same, omits any reference to manufacturing; indeed, nothing therein relates to how or by whom the article is to be produced; production cost and who shall bear the same; how raw materials, patterns, designs and samples will be supplied; in what manner plaintiff's invention and patent, if one exists, shall be transferred and to whom; and when production is to begin. Likewise, as to the marketing of the item, absent is any reference to territory, whether distribution is to be exclusive, who is to set the price, and the minimum amount to be sold in what period of time. Relative to the $50 figure mentioned, it appears to be only a suggested possible sales price used as a basis for speculation as to within what time, how many, and at what amount the items could be sold; and far from fixing the selling price, the figure constitutes no more than an expression of opinion of

what possible returns "could" be expected and what "could" be done if sufficient time and money are expended on a proper program. Nor is there mention of how much out of any established sales price defendants are to receive on each item for their services, and how much is to be paid plaintiff. The "suggested percentage" is exactly what it purports to be—a suggestion of what "could" be worked out in the future "should (plaintiff) decide to give (them) a try in merchandising and marketing the item." That this letter was by no means intended to constitute an offer is found in the last paragraph wherein defendants expressed their hopes that "something *like* this" would be acceptable to plaintiff. (Emphasis added.)

Concerning "a joint adventure or partnership" arrangement, neither mention nor reasonable inference thereof can be found in the writing; we do not know what plaintiff is to contribute (patent rights or "license to use"), the financing necessary and who will supply it, how the device is to be manufactured or who will control and manage the production, marketing and merchandising.

On August 27, 1955, plaintiff, referring to defendants' letter of August 24, responded (Ex. 1-B) in part:

"I appreciate your expression in regard to my invention designed for the recovery of precious metals, and I too heartily agree with you as to the great possibilities that the invention presents . . .

"After due consideration, and in view of my age and other circumstances I would like to sell the invention outright as I have already expressed to you, possibly taking less down payment—$5,000 instead of $10,000 and the balance on or before five years to make up the $50,000, which I have no doubt would be fair to assume would be available from the profits.

"I hope that within the different views we have expressed, something of mutual interest may be worked out."

Herein plaintiff rejected consideration of any arrangement to market and merchandise his invention and professed interest only in its outright sale. Appellant does not dispute that defendants' August 24 letter relates only to marketing and merchandising; and it is obvious his reply actually proposes a plan altogether different than that suggested by defendants, revealing an absence of any meeting of the minds and a complete lack of interest in any program excluding outright sale. Had Exhibit 1-A constituted an offer of any kind, Exhibit 1-B completely negates plaintiff's claim he accepted it—for at most his letter of August 27 amounted to no more than a

counterproposal by him rejecting any plan heretofore proposed by defendants and terminating any further discussions relative thereto.

That there was no meeting of the minds and defendants, not interested in an outright sale, intended no further discussion of its prior proposal, is borne out by their letter of September 13 (Ex. 1-C):

"Thank you very much for your letter of August 27th. We can readily appreciate your position and your desire for a cash payment rather than a larger sum to come out of earnings.

"Should you, at a future date, decide that you might be interested in a joint venture plan that would involve no immediate cash pay-out, we should be very happy to make up the necessary sample pieces of equipment, have the brochures made, and launch a very thorough merchandising program. I am sure we could do a very good job and that you would be most gratified with the results. Looking forward to hearing from you at your early convenience."

Rejecting plaintiff's counterproposal of an outright sale in which defendants had obviously heretofore evinced no interest, and failing to renew further discussion of their original suggestion to market and merchandise the item defendants for the first time invited plaintiff's interest in, and consideration of, a possible joint venture plan.

On September 20, 1955, plaintiff responded with the following Exhibit 1-D, which he contends constituted the acceptance of the offer he claims was contained in defendants' letter of August 24, 1955:

"After careful consideration I have decided to accept your proposition as outlined in your letter to me of August 24th, 1955 with this proviso: that you agree to put this product in production within a definite period of time from the date of the signing of any agreement between us.

"I would welcome an opportunity to discuss this matter with you at your earliest convenience."

Having concluded in the first instance that Exhibit 1-A did not constitute an offer upon which an enforceable contract could be based, and had it amounted to a valid offer it was rejected by plaintiff's Exhibit 1-B terminating the same, which "offer" he could not later revive by accepting it creating a contract without some act of defendants manifesting consent (*Ajax Holding Co.* v. *Heinsbergen,* 64 Cal.App.2d 665 [149 P.2d 189]), inasmuch as further correspondence is relied upon by appellant to supply that consent we briefly

discuss his contention. Appellant's position that the September 20 letter constituted an acceptance resulting in a meeting of the minds is predicated on the false premise that defendants' letter of August 24 contained an offer which in spite of his intervening letter remained open. However, borrowing this premise solely for discussion, that the letter could not constitute an acceptance finds support in well-established authority and in the only reasonable interpretation that can be given to the writing itself.

It is fundamental that without consent of the parties, which must be mutual (Civ. Code, § 1565), no contract can exist (Civ. Code, § 1550). Consent cannot be mutual unless all parties agree upon the same thing in the same sense (Civ. Code, § 1580). ▪ Hence, terms proposed in an offer must be met exactly, precisely and unequivocally for its acceptance to result in the formation of a binding contract (*Laird* v. *McPhee*, 90 Cal.App. 136 [265 P. 501]; *Caldwell* v. *Dalaray Mines, Inc.*, 68 Cal.App.2d 180 [156 P.2d 52]; *American Aeronautics Corp.* v. *Grand Central Aircraft Co.*, 155 Cal.App.2d 69 [317 P.2d 694]); and a qualified acceptance amounts to a new proposal or counteroffer putting an end to the original offer (*Niles* v. *Hancock*, 140 Cal. 157 [73 P. 840]; Civ. Code, § 1585; *Hunkins-Willis etc. Co.* v. *Los Angeles etc. Co.*, 155 Cal. 41 [99 P. 369]; *Patterson* v. *Clifford F. Reid, Inc.*, 132 Cal.App. 454 [23 P.2d 35]; *Lawrence Block Co.* v. *Palston*, 123 Cal. App.2d 300 [266 P.2d 856]; *American Aeronautics Corp.* v. *Grand Central Aircraft Co.*, 155 Cal.App.2d 69 [317 P.2d 694]). ▪ An offer "must be approved in the terms in which it is made. The addition of any condition or limitation is tantamount to a rejection of the original offer and the making of a counteroffer (*Alexander* v. *Bosworth,* 26 Cal.App. 589 [147 P. 607]). ▪ A counteroffer containing a condition different from that in the original offer is a new proposal and, if not accepted by the original offeror, amounts to nothing (*Cooper* v. *Stansbury,* 28 Cal.App. 444 [152 P. 948])." (*Ajax Holding Co.* v. *Heinsbergen,* 64 Cal.App.2d 665, 669 [149 P.2d 189]; *Lawrence Block Co.* v. *Palston,* 123 Cal. App.2d 300 [266 P.2d 856].) ▪ "Where a person offers to do a definite thing and another introduces a new term into the acceptance, his answer is a mere expression of willingness to treat or is a counter proposal, and in neither case is there a contract; if it is a new proposal and it is not accepted it amounts to nothing (citations)." (*American Aeronautics*

*Corp.* v. *Grand Central Aircraft Co.*, 155 Cal.App.2d 69, 80 [317 P.2d 694].)

 To argue that the word "proviso" used by plaintiff in his alleged acceptance refers only to a "suggestion for better terms" and not to a new and different proposal varying with, and completely modifying, the terms of the original alleged offer (Ex. 1-A), is to ignore any reasonable construction of the latter writing. Nowhere mentioned therein (Ex. 1-A) was any proposal to manufacture or produce the machine—only a plan to merchandise and market it through an exclusive sales promotion. Obviously production by defendants was not contemplated. Plaintiff's alleged acceptance (Ex. 1-D) contains the first mention that defendants are "to put this product in production," introducing a completely new proposal for their consideration. It is one thing to merchandise and market an item, quite another to assume the burden of producing it—requiring equipment, cost outlay, raw materials, designs, patterns, samples, etc. And what plaintiff means by the term "production" is not clear, but by the "proviso" he seeks to specifically place on defendants the burden of putting "this product into production" within a definite time to be later determined.

An analysis of plaintiff's letter points up three inescapable conclusions (1) a new proposal modifying defendants' original plan to merchandise and market the invention was introduced for the first time by plaintiff—its "production"; (2) plaintiff specifically contemplated that before the parties were to be bound there was to be the signing of an agreement; and (3) nothing binding then existed between the parties, even in the mind of plaintiff for he explicitly invited further discussions of "this matter."

On October 3, 1955, defendants responded (Ex. 1-E) to plaintiff's letter of September 20 as follows:

"I was pleased indeed to receive your letter stating that you were ready to go ahead with us on your invention.

"The past couple of weeks have been quite hectic with us. We have a large industrial gift program and September and October are very heavy months for us. I will give you a ring just as soon as I can see things clearing up, as I am anxious to work with you on your portable grinder and gold-reclaimer."

Although the letter was noncommittal about everything but that defendants were too busy to go into the matter at that time, and neither mentioning the new proposal nor renewing interest in their original suggestion, defendants did, however,

express their desire to work with plaintiff on the machine in the future. Appellant argues that this letter constituted defendants' consent to a revival of the original offer (Ex. 1-A) and his acceptance thereof (Ex. 1-D). The revival theory is not here tenable for if an offer ever in fact existed, it was long before terminated by plaintiff himself; and he could not revive its effectiveness since the original proposal was for one thing (a merchandising and marketing program), while the "proviso" in his so-called acceptance placed on defendants an entirely new burden (production), which in their previous proposal they had neither intended nor mentioned. In addition, the "proviso" created still another new and different proposal requiring the reduction of any agreement they might enter into to writing (*American Aeronautics Corp.* v. *Grand Central Aircraft Co.*, 155 Cal.App.2d 69 [317 P.2d 694]).

Approximately two and a half months later, defendants on December 15 wrote plaintiff (Ex. 1-F) the following:

"I am still running behind schedule, even to my good intentions to get a letter off to you Monday as I mentioned during our last interview.

"It looks like it would be March of 1956 before we will be in a position to go into the production of your portable grinder and gold reclamation device. Just as soon as we have a sample made we will be in a position to ascertain the quantity of machines that we can turn out quarterly, and reports will be furnished to you at that time.

"Thanking you for your patience, faith and goodwill, and wishing you and yours the very best for the coming year, I am ..."

This relates to production; but that the minds of the parties had yet to meet on terms is reflected in the fact that no trial run or sample had been made, the parties were uncertain of the quantity that could be produced, and were holding consideration of terms in abeyance until reports which, without doubt, would include quantity, cost and other related items, could be furnished. It is obvious neither party intended to be bound until it was known where they stood on production and could work out the details which would determine the terms of their contemplated agreement.

Exhibit 1-F was the last letter in the series relied upon by appellant to constitute the agreement sued upon. We find nothing in the record before us evidencing any meeting of the minds of the parties on any matters relating to the manufacture, production, development, merchandising or marketing

of plaintiff's invention. No definite proposal ever resulted from the various written discussions and suggestions and no binding contract ever came into existence.

We refer only briefly to appellant's claim that there was no mutual understanding that the parties were not to be bound until a formal contract was executed. Having heretofore held that the letter of August 24 did not constitute a valid offer and thus no acceptance existed, we are in agreement with this contention, for there was no mutual understanding that the parties do anything; however, following appellant's line of argument, we construe the "proviso" in his alleged acceptance of September 20 as not only creating a new proposal that defendants were also to produce the item, but another that any agreement entered into be signed—for the time for beginning production was predicated upon "a definite period of time from the date of the signing of any agreement between us." Defendants also understood the "proviso" to provide for the execution of a formal agreement for they, in reliance thereon, proceeded to make tentative plans on the basis that no one would be bound until an agreement was signed. It is clear from Exhibit 1-F that although defendants intended to start production in the future and make a sample, nothing further was to be done in furtherance of any plan until production reports were furnished.

Until such a formal agreement is signed no reasonable construction of the letters can establish a contract. It is well settled that, if the parties intend a reduction of their proposed agreement to writing before it can be considered complete, there is no contract until the formal agreement is signed (*Store Properties, Inc.* v. *Neal,* 72 Cal.App.2d 112 [164 P.2d 38]; *Spinney* v. *Downing,* 108 Cal. 666 [41 P. 797]; *Las Palmas etc. Distillery* v. *Garrett & Co.,* 167 Cal. 397 [139 P. 1077]; *Linnard* v. *Sonnenschein,* 94 Cal.App. 729 [272 P. 315]; *Kessinger* v. *Organic Fertilizers, Inc.,* 151 Cal.App.2d 741 [312 P.2d 345]; *American Aeronautics Corp.* v. *Grand Central Aircraft Co., supra,* 155 Cal.App.2d 69, stated at page 80: "It is a general rule to which this case presents no exception that, when it is a part of the understanding between the parties that the terms of their contract are to be reduced to writing and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon or it does not become a binding or completed contract." Although the majority of cases discussing this issue deal with oral negotiations, there

is no reason why the same principle should not apply to preliminary written discussions. The "proviso" left the terms of production open for future consideration and required the reduction of *any* agreement to writing. It has long been settled that "(t)he preliminary negotiation leading up to the execution of a contract must be distinguished from the contract itself. There is no meeting of the minds of the parties while they are merely negotiating as to the terms of the agreement to be entered into. To be final, the agreement must extend to all terms which the parties intend to introduce, and material terms cannot be left for future settlement; nor is there any binding contract where, although its terms have been agreed on orally, the parties have also agreed that it shall not be binding until evidenced in writing" (*Dillingham* v. *Dahlgren,* 52 Cal.App. 322, 329 [198 P. 832]).

 Relative to appellant's last contention that the evidence proposed by his offer of proof was admissible as an admission by defendants of the very fact of a contract, he urges that the trial court erred in refusing the offer.

In substance, he offered to prove that after September 20, 1955, plaintiff had one to five conversations relating to production and marketing, personally and by telephone, with Selleck, and in none did he (Selleck) deny a contract existed; and that Selleck made five to six visits to plaintiff's office where he discussed the details, outlines and type of machine to be manufactured, and plans which he had discussed with one Beckwith relative to what would be required for production and the type and kind of device best suited for the market.

We do not believe the offer of proof, under the circumstances, merits a full and complete disclosure of exactly what it contained except to point out that even if plaintiff proved the same, the evidence would show no more than that the parties preliminarily orally discussed the merits of the machine, what the production problems might be and details for setting up a production plan, all of which are entirely consistent with the preliminary written discussions which eventually might have resulted in a definite written proposal. This far from shows that defendants recognized the existence of a contract or that their conduct and activity in discussing possible preliminary production details recognized the effectiveness of a contract; but on the contrary, shows that even then the parties were still experimenting in production, formu-

lating plans, and preparing to enter into something of a definite nature which could be made certain only upon the furnishing of production reports; and that both were endeavoring to set up and formulate a plan to put the item into production in the future.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 24, 1960.