[No.B116436. Second Dist., Div. Three. Mar. 19, 1998.]

BANNER ENTERTAINMENT, INC., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
ALCHEMY FILMWORKS, INC., Real Party in Interest.

**COUNSEL**

Katten Muchin & Zavis, Steve Cochran and Raymond Wu for Petitioner.

No appearance for Respondent.

Fox & Spillane and Jay M. Spillane for Real Party in Interest.

**OPINION**

**CROSKEY, J.**—Petitioner Banner Entertainment, Inc. (Banner) seeks a writ of mandate directing the trial court to vacate its order compelling Banner to arbitrate a dispute between Banner and real party in interest, Alchemy Filmworks, Inc. (Alchemy). We issued an alternative writ of mandate and stayed the arbitration pending determination of this writ proceeding. For the reasons explained below, we conclude that no enforceable agreement to arbitrate exists, that the trial court therefore erred by entering an order to compel arbitration, and that Banner is entitled to the writ of mandate which it seeks.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Banner, as plaintiff, has filed a complaint which alleges causes of action for declaratory relief, constructive fraud, intentional and negligent interference with prospective business relations, and common counts (the action). Banner filed the action after Alchemy submitted to the American Arbitration Association (AAA) a demand for arbitration of the parties' dispute over a purported agreement between Banner and Alchemy.

After filing the action, Banner then filed therein a motion to determine the nonarbitrability of the claims Alchemy had submitted for arbitration. Alchemy filed a cross-motion in the action to compel arbitration of not only the claims it had submitted to the AAA, but also of all disputes arising out of Banner's relationship with Alchemy.[2]

In support of its motion, Banner presented the following evidence in the form of declarations.

Mickey Liddell, Banner's president, stated that in the spring of 1996, Banner, which was seeking to market its films TRAVELER and TELLING LIES IN AMERICA (the Films), met with Ann Dubinet, Alchemy's president, and other representatives of Alchemy to discuss Alchemy's ability to act as a sales agent for the Films in countries outside the United States and Canada (the Foreign Territories). Banner agreed to send Alchemy to Cannes in May, 1996, to market the Films, and to pay Alchemy a 10 percent commission on its sales. At that time, Banner and Alchemy were still negotiating the terms of an arrangement by which Alchemy would act as overseas sales agent for the Films. It was Liddell's understanding, as well as the understanding of others at Banner, that when Banner agreed to send Alchemy to Cannes, "Alchemy and Banner were to continue negotiating a longer term relationship and, if an agreement could be reached, would eventually memorialize that relationship in writing."

---

[1]The following facts are taken from the verified petition for a writ of mandate, to the extent such facts are admitted by the verified answer, and from the evidence submitted by each party in support of their cross-motions on the issue of whether they had an enforceable agreement to submit their disputes to arbitration.

[2]Although neither the petition nor the answer refers to such facts, Alchemy states, at page 10 of its memorandum of points and authorities in support of its answer to the petition, that Banner filed a federal action against Alchemy after Alchemy filed its demand for arbitration with the AAA, that while the federal action was pending, Alchemy filed a petition to compel arbitration in Alchemy Filmworks, Inc. v. Banner Entertainment, Inc. (Super. Ct. L.A. County, 1997, No. 175185), that the federal court stayed the petition to compel arbitration, that the federal court subsequently dismissed Banner's federal action and lifted the stay as to Alchemy's petition to compel arbitration, and that ultimately the parties agreed that the question of arbitrability would be decided by cross-motions in this action.

According to Liddell, on or about April 16, 1996, Banner received from Alchemy two proposed draft agreements which purportedly were intended to create a more formal and permanent relationship between Alchemy and Banner. He reviewed the agreements (one for each of the two Films), and noted they contained provisions which had never before been discussed nor negotiated between Banner and Alchemy. He then forwarded them to Banner's outside legal counsel for review.

In mid-May, 1996, Liddell and Alchemy's representatives traveled to Cannes to market the Films. He learned from representatives of a Spanish distributor that Alchemy was misrepresenting its authority vis-à-vis the Films, as well as misrepresenting other information about the Films, such as budget size and endorsement and distribution arrangements.[3]

On or about June 21, 1996, Banner's outside legal counsel, Dennis Cline, returned the preliminary draft agreements to Liddell with Cline's typewritten comments in the margins. However, because of what Liddell had observed in Cannes, Banner decided to terminate Alchemy's authority to act as a sales agent, and on July 31, 1996, Liddell and Brian Swardstrom, who was also affiliated with Banner, spoke with Dubinet by telephone and notified her that Alchemy was no longer authorized to act as Banner's sales agent with respect to the Films. Banner then confirmed this oral notification with a letter from Cline to Alchemy, dated August 2, 1996. Shortly after Banner notified Alchemy that it no longer authorized Alchemy to act as its agent, it received from Alchemy a revised draft of the preliminary draft agreements regarding the Films.

Banner never signed any version of the preliminary draft agreements. In late June, 1997, Banner received a demand for arbitration from Alchemy.

Bonnie Voland, the president of a company in the business of providing advice regarding international sales and marketing of motion pictures, declared that she had worked in the film marketing industry since 1985, and was familiar with the people operating both Banner and Alchemy; Banner as an existing client, and Alchemy as a former employee during the period of January 1, 1996, through September 15, 1996. In 1996, Voland attended the Cannes Film Festival as a member of Alchemy's staff. She attended meetings with Dubinet, during which meetings Dubinet was attempting to make deals for the foreign distribution of films produced by Banner and other

---

[3]Liddell listed a number of other allegedly improper representations and actions taken by Alchemy, which we do not set out in any detail, because they, like the few examples already set out above, are irrelevant to the issue presented here: whether the parties ever entered into a binding agreement which included an arbitration provision.

companies. She recounted various representations made by Dubinet during these meetings, and also stated that Dubinet did not return all of Banner's calls (calls made by Liddell, Banner's president), and that Alchemy and Banner did not meet twice a day during the festival to strategize about marketing strategy, as apparently agreed upon between Alchemy and Banner.

In addition to the Voland and Liddell declarations, Banner supported its motion on the issue of arbitrability with copies of (1) the August 2, 1996, letter from Cline to Alchemy, (2) the demand for arbitration by Alchemy, and (3) the April 16, 1996, letters from Alchemy to Banner with the proposed terms for the parties' contractual relationship with respect to the engagement of Alchemy as Banner's sole and exclusive sales agent for the Films in countries other than the Foreign Territories. These April 16, 1996, letters provided, in relevant part: "15. More formal agreement; The parties hereto anticipate entering into a more formal agreement incorporating the above terms, together with such other provisions as are customary for arrangements of this kind. Until such time, if ever, as such more formal agreement in [sic—is] concluded, this agreement *when signed by the parties hereto* will constitute a legal and binding obligation of the parties. [¶] Please acknowledge your approval of the foregoing terms by signing a copy of this letter in the space indicated below." (Italics added.)

In its opposition to Banner's motion, Alchemy objected to the Voland and Liddell declarations to the extent they addressed the substance of Alchemy's performance, on the grounds that such matters were irrelevant on the issue of whether an agreement to arbitrate had been created, and to other irrelevant material related to Alchemy's alleged wrongdoing. More to the point as to the issue on review in this opinion, Alchemy also objected to Liddell's declaration on the grounds that Banner's "subjective and unarticulated 'understanding" of the situation" was not relevant and that Liddell's testimony concerning the purported intention surrounding Alchemy's delivery to Banner of the draft contracts lacked foundation and was speculative.

In addition to objecting to Banner's evidence, Alchemy presented its own evidence in opposition to Banner's motion: (1) a "to whom it may concern" letter from a Spanish film distributor (which was entirely irrelevant on the issue of whether there was an agreement to arbitrate, and which went only to the issue of Alchemy's purported misbehavior as an agent); and (2) the declaration of Monica Hsu, an employee of a Taiwanese film distributor (which also was irrelevant to whether Banner and Alchemy had entered into a binding agreement to arbitrate).

As noted above, the parties had filed cross-motions on the issue of arbitrability. Alchemy supported its own motion to compel arbitration with a request for the court to take judicial notice of the declaration of Dubinet, which Alchemy previously had filed in support of Alchemy's petition to compel arbitration in Alchemy Filmwork, Inc. v. Banner Entertainment, Inc., *supra*, No. 175185.[4] Dubinet's declaration provided, in relevant part, that (1) in February 1996, Banner contacted her about Alchemy's acting as foreign sales agent with respect first to TRAVELER and, a few weeks later, to TELLING LIES IN AMERICA; (2) Banner agreed to grant Alchemy the exclusive right to license rights to the Films in the Foreign Territories and to advance Alchemy's expenses incurred on behalf of Banner; (3) Alchemy prepared the April 16, 1996, draft agreements and delivered them to Banner; (4) Banner, as required by paragraph 6 of the draft agreements, sent Alchemy some $91,645 for Alchemy's anticipated expenses in attending the Cannes Film Festival; (5) after the film festival, Dubinet reminded Banner that it had not yet provided comments on the draft agreements; (6) on June 20, Alchemy received a copy of Cline's June 20, 1996, letter to Banner with his suggested annotations to the draft agreements, which contained no comments about the arbitration clause; (7) on June 25, 1996, she sent the draft agreements and Cline's comments to Alchemy's legal counsel, who then prepared new versions of the draft agreements incorporating Cline's proposed changes and a few of their own and sent them to Alchemy on July 26, 1996; (8) on July 31, 1996, Dubinet signed the revised versions of the draft agreements and delivered them to Banner that same morning; (9) on the afternoon of July 31, 1996, Banner called her and told her it was terminating its agreement with Alchemy; and (10) on August 2, 1996, Alchemy received a letter from Cline on behalf of Banner which stated that the parties had not reached agreement on material terms, but which did not state that Banner had ever objected to the arbitration clause. Banner's opposition to Alchemy's motion contained, as evidence in opposition, the Voland and Liddell declarations noted above.

The trial court heard the motion and cross-motion on October 10, 1997, and, on the same date, filed an order granting Alchemy's motion for an order

---

[4]Rather than requesting judicial notice of the fact that a declaration was filed in another case, Alchemy simply should have filed Dubinet's declaration in this action. A request for judicial notice raises various evidentiary issues as to whether a court can take judicial notice only of the fact a declaration was filed in another proceeding, as opposed to whether it can take judicial notice of the facts contained in the declaration themselves. Rather than enter that morass, we shall simply assume for the sake of argument that this declaration was filed in the action, given that we have determined that even granting Alchemy the benefit of doubt as to this evidentiary problem will not alter the ultimate result.

compelling arbitration and staying the action. That order contained no findings of fact.[5]

## CONTENTIONS ON WRIT PROCEEDING

Banner contends that there was no agreement to arbitrate because (1) the parties' conduct did not establish that there was such an agreement, and (2) the preliminary draft agreements, which provided that by signing them Banner would manifest its intent to agree to the draft agreements' terms, were never signed. Alchemy, on the other hand, contends that the trial court's order compelling arbitration was consistent with the strong policy favoring arbitration and did not deprive Banner of a constitutional right to jury trial, and that the trial court did not abuse its discretion when it weighed the evidence and resolved any doubts in Alchemy's favor.

## DISCUSSION

### 1. *Standard of Review*

A party who claims that there is a written agreement to arbitrate may petition the superior court for an order to compel arbitration. (Code Civ. Proc., § 1281.2.) Such a proceeding is simply a suit in equity seeking specific performance of a contract to arbitrate. (*Engineers & Architects Assn.* v. *Community Development Dept.* (1994) 30 Cal.App.4th 644, 653 [35 Cal.Rptr.2d 800].) It follows, of course, that if there was no valid contract to arbitrate, the petition must be denied. (*Ibid.* ["There is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate. [Citation.]"; *Boys Club of San Fernando Valley, Inc.* v. *Fidelity & Deposit Co.* (1992) 6 Cal.App.4th 1266, 1271 [8 Cal.Rptr.2d 587].)

Code of Civil Procedure section 1280 et seq. provides a procedure for the summary determination of whether a valid agreement to arbitrate exists, and such summary procedure satisfies both state and federal law (i.e., the Federal Arbitration Act, 9 U.S.C. §§ 1-6 (FAA)). (*Rosenthal* v. *Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413 [58 Cal.Rptr.2d 875, 926 P.2d 1061].) Under this procedure, the petitioner bears the burden of establishing the existence of a valid agreement to arbitrate, and a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense. (*Ibid.*) The trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary

---

[5]In its oral comments to the parties, the court did appear to rely upon the fact that, during negotiations between the parties, Banner never objected to the arbitration clause in the contracts being negotiated, and on the fact that there is a general policy in favor of arbitration.

evidence, as well as oral testimony received at the court's discretion, to reach a final determination on the issue of arbitrability. (*Id.* at pp. 413-414.) A decision on such issues with respect to a contract governed by the FAA must be made with due regard to the federal policy favoring arbitration. (*City of Vista* v. *Sutro & Co.* (1997) 52 Cal.App.4th 401, 407 [60 Cal.Rptr.2d 488].) However, even if one of the parties contends that the FAA applies to their agreement to arbitrate, the FAA does not apply until the existence of an enforceable arbitration agreement is established under state law principles involving formation, revocation and enforcement of contracts generally. (*Cione* v. *Foresters Equity Services, Inc.* (1997) 58 Cal.App.4th 625, 634 [68 Cal.Rptr.2d 167].)

On appeal, if substantial evidence supports the trial court's determination that a valid agreement to arbitrate exists, an appellate court will affirm that determination. (*City of Vista* v. *Sutro & Co., supra,* 52 Cal.App.4th at p. 407; *Owens* v. *Intertec Design, Inc.* (1995) 38 Cal.App.4th 72, 74 [44 Cal.Rptr.2d 840].)

Here, Banner did not wait for Alchemy to bring a petition to compel arbitration. Instead, after filing its own action at law, it engaged in a "preemptive strike" by bringing a motion for determination that the dispute with Alchemy was not subject to arbitration. Alchemy, rather than pursuing its previously filed petition to compel arbitration, then opposed Banner's motion and filed its own cross-motion for an order compelling arbitration. This unique procedural posture, coupled as it is with the lack of any express factual findings or evidentiary rulings, might have presented some difficulty on review, but for the fact that there is no evidence at all which would support a finding of an agreement to arbitrate, as explained below.

2. *General Principles of California Contract Law*

As noted above, to determine whether there is an enforceable arbitration agreement, we apply state law principles related to the formation, revocation and enforcement of contracts. In this case, California law is expressly incorporated into the allegedly enforceable contract in which the arbitration agreement in question appears, and therefore California law governs the adjudication of any disputes arising from that agreement. ■ California law incorporates many of the basic policy objectives contained in the FAA, including a presumption in favor of arbitrability and a requirement that an arbitration agreement must be enforced on the basis of state law standards that apply to contracts in general. (*Engalla* v. *Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971-972 [64 Cal.Rptr.2d 843, 938 P.2d 903].) These policies guide our determination of the present matter. California law

is clear that there is no contract until there has been a meeting of the minds on *all* material points. (*Louis Lesser Enterprises, Ltd.* v. *Roeder* (1962) 209 Cal.App.2d 401, 404-405 [25 Cal.Rptr. 917]; *Apablasa* v. *Merritt & Co.* (1959) 176 Cal.App.2d 719, 730 [1 Cal.Rptr. 500]; *Kessinger* v. *Organic Fertilizers, Inc.* (1957) 151 Cal.App.2d 741, 749-750 [312 P.2d 345].)

■  When it is clear, both from a provision that the proposed written contract would become operative *only* when signed by the parties as well as from any other evidence presented by the parties that both parties contemplated that acceptance of the contract's terms would be signified by signing it, the failure to sign the agreement means no binding contract was created. (*Beck* v. *American Health Group Intern., Inc.* (1989) 211 Cal.App.3d 1555, 1562 [260 Cal.Rptr. 237], and cases cited there; *Forgeron, Inc.* v. *Hansen* (1957) 149 Cal.App.2d 352, 360 [308 P.2d 406]; *Roth* v. *Garcia Marquez* (9th Cir. 1991) 942 F.2d 617, 626-627.) This is so even though the party later sought to be bound by the agreement indicated a willingness to sign the agreement. (*Forgeron, Inc.* v. *Hansen, supra,* 149 Cal.App.2d at p. 360.) On the other hand, if the respective parties orally agreed upon all of the terms and conditions of a proposed written agreement with the mutual intention that the oral agreement should thereupon become binding, the mere fact that a formal written agreement to the same effect has not yet been signed does not alter the binding validity of the oral agreement. (*Columbia Pictures Corp.* v. *DeToth* (1948) 87 Cal.App.2d 620, 629 [197 P.2d 580].)[6]

■  Whether it was the parties' mutual intention that their oral agreement to the terms contained in a proposed written agreement should be binding immediately is to be determined from the surrounding facts and circumstances of a particular case and is a question of fact for the trial court. (*Schwartz* v. *Shapiro* (1964) 229 Cal.App.2d 238, 248 [40 Cal.Rptr. 189]; *Columbia Pictures Corp.* v. *DeToth, supra,* 87 Cal.App.2d at p. 629.) Evidence as to the parties' understanding and intent in taking what actions they did take is admissible to ascertain when or whether a binding agreement was ever reached. (Code Civ. Proc., § 1856, subds. (f), (g); *Thomson* v. *Internat. Alliance of Stage Employees* (1965) 232 Cal.App.2d 446, 453 [42 Cal.Rptr. 785]; *Mitchell* v. *Leslie* (1995) 39 Cal.App.4th Supp. 7, 12 [46 Cal.Rptr.2d 419].)[7]

Mutual intent is determinative of contract formation because there is no contract unless the parties thereto assent, and they must assent to the same

---

[6] We do not mean to suggest by this recitation of a basic principle of contract law that an enforceable agreement to arbitrate need not be in written form. (See, e.g., 9 U.S.C. § 2 and Code Civ. Proc, § 1281 et seq.; *Horn* v. *Gurewitz* (1968) 261 Cal.App.2d 255, 258-259 [67 Cal.Rptr. 791].) The critical issue in this matter is whether a *proposed* written agreement is binding on a party who has not signed it.

[7] Thus, Liddell's testimony that, when Banner agreed to send Alchemy to Cannes and pay its expenses incurred in marketing the Films while there, Banner was still in negotiations over

thing, in the same sense. (*Kessinger* v. *Organic Fertilizers, Inc., supra,* 151 Cal.App.2d at p. 750.) "It is essential to the existence of every contract that there should be a reciprocal assent to a definite proposition, *and when the parties to a proposed contract have themselves fixed the manner in which their assent is to be manifested, an assent thereto, in any other or different mode, will not be presumed."* (*Ibid.,* italics added.) Thus, the failure to reach a meeting of the minds on all material points prevents the formation of a contract *even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract.* (*Grove* v. *Grove Valve & Regulator Co.* (1970) 4 Cal.App.3d 299, 311-312 [84 Cal.Rptr. 300]; *Louis Lesser Enterprises, Ltd.* v. *Roeder, supra,* 209 Cal.App.2d at pp. 404-405; *Apablasa* v. *Merritt & Co., supra,* 176 Cal.App.2d at p. 730; *Kessinger* v. *Organic Fertilizers, Inc., supra,* 151 Cal.App.2d at pp. 749-750.)

3. *There Is No Substantial Evidence to Support the Trial Court's Implied Finding That the Parties Agreed to Arbitration*

Here, the relevant and uncontradicted evidence before the trial court consisted of: (1) the April 16, 1996, draft agreements, prepared by Alchemy, which specifically provided, in relevant part: "this agreement *when signed by the parties hereto* will constitute a legal and binding obligation of the parties. [¶] *Please acknowledge your approval of the foregoing terms by signing a copy of this letter in the space indicated below*"; (2) Liddell's declaration stating that (a) Banner never signed the draft agreements; (b) in March and April 1996, Banner and Alchemy agreed to send Alchemy to the Cannes Film Festival to market the Films, and to pay Alchemy 10 percent commission on its sales; (c) at the time the oral agreement to send Alchemy to Cannes to market the Films was reached, Banner and Alchemy were still negotiating the terms of an agreement for Alchemy to act as overseas sales agent for the Films in a longer-term relationship (inferentially, for a longer period of time than the duration of the Cannes Film Festival); and (d) the April 16, 1996, proposed draft agreements contained many provisions which had never been discussed or negotiated in Banner and Alchemy's previous dealings, and (3) Dubinet's declaration that (a) in February 1996, Banner contacted her about Alchemy acting as foreign sales agent with respect first to TRAVELER and, a few weeks later, TELLING LIES IN AMERICA; (b) Banner agreed to grant Alchemy the exclusive right to license rights to the Films in the Foreign Territories and to advance Alchemy's expenses on behalf of Banner; (c) Alchemy prepared the April 16, 1996, draft agreements and delivered them to Banner; (d) Banner sent Alchemy some $91,645 for

---

the terms of a longer-term relationship with Alchemy which, if they could agree on the terms, would be memorialized in a writing, was clearly admissible, despite Alchemy's objections thereto.

Alchemy's anticipated expenses in attending the Cannes Film Festival; (e) after the film festival, Dubinet reminded Banner that it had not yet provided comments on the draft agreements; (f) in response, on June 20, Alchemy received a copy of Cline's June 20, 1996, letter to Banner with his suggested annotations to the draft agreements, which contained no comments about the arbitration clause; (g) on June 25, 1996, she sent the draft agreements and Cline's comments to Alchemy's legal counsel, who then prepared new versions of the draft agreements incorporating Cline's proposed changes and a few of their own and sent them to Alchemy on July 26, 1996; (h) on July 31, 1996, Dubinet signed the revised versions of the draft agreements and delivered them to Banner that same morning; (i) on the afternoon of July 31, 1996, Banner called her and told her it was terminating its agreement with Alchemy; and (j) on August 2, 1996, Alchemy received a letter from Cline on behalf of Banner which stated that the parties had not reached agreement on material terms, but which did not state that Banner had ever objected to the arbitration clause.

Notably, Alchemy presented no evidence that, during the negotiations which culminated with the alleged agreement granting Alchemy the exclusive right to license rights to the Films in the Foreign Territories and agreeing to advance Alchemy's expenses on behalf of Banner, the parties orally or otherwise discussed, let alone agreed, that any disputes in connection with such work by Alchemy would be resolved by arbitration. Nor did it present any evidence that, despite the fact it had drafted the April 16, 1996, agreements and provided therein that assent to the terms would be manifested by signing the drafts and returning them to Alchemy, the parties orally agreed that assent to such terms, including the arbitration clause, could be manifested in some other manner.

Thus, while there is evidence that Banner at *least* orally agreed to send Alchemy to the Cannes Film Festival to market the Films and to pay Alchemy 10 percent of any sales it achieved, or that, at *best*, Banner agreed to grant to Alchemy the exclusive rights to license rights to the Films in the Foreign Territories and agreed to pay Alchemy's expenses in marketing the Films, there is *no* evidence of *any agreement*, oral or otherwise, to *arbitrate* any disputes related to whatever oral agreement (marketing at Cannes Film Festival only, or exclusive rights to license rights to the Films in the Foreign Territories) the parties did make. In addition to the absence of such evidence, there is evidence, in the form of Liddell's declaration, that after Banner and Alchemy orally agreed that Alchemy should market the Films at the Cannes Film Festival, the parties continued to negotiate a longer-term agreement which was to be reduced to writing if an agreement was reached, that some of the terms in the April 16, 1996, draft agreements were not matters the

parties had previously discussed, so he sent them out for a legal opinion, that Alchemy, too, made changes to the draft agreements and then resubmitted them to him, and that he never signed them and, in fact, told Alchemy that Banner was no longer interested in entering into any further relationship because of his dissatisfaction with Alchemy's work at the film festival. Thus, the uncontradicted evidence shows that the parties never reached an agreement which included all the terms contained in the draft agreements, either before or after the Cannes Film Festival.

Alchemy's reliance on various cases for the proposition that arbitration may be compelled based on an unsigned agreement is misplaced. In *Genesco, Inc.* v. *T. Kakiuchi & Co., Ltd* (2d Cir. 1987) 815 F.2d 840, 845 and *Medical Development Corp.* v. *Industrial Molding Corp.* (10th Cir. 1973) 479 F.2d 345, 347-348, both parties to the purported arbitration agreement had been involved in previous buyer/seller relationships, and had performed in the past according to *signed* form contracts which contained arbitration provisions. In each case, when one party thereafter demanded arbitration as to a matter in a subsequent unsigned form contract which was identical to the earlier signed contracts, the trial court found that the failure to sign the later contracts was irrelevant, and concluded that the *evidence of past dealings* showed that the parties had agreed to arbitrate such disputes. In *Valero Refining, Inc.* v. *M/T Lauberhorn* (5th Cir. 1987) 813 F.2d 60, 63-64, the plaintiff argued that the arbitration clause in the agreement was not enforceable because the agreement was neither signed nor dated, and therefore there was no evidence that both parties agreed to the terms. The trial court found that there was evidence that the parties agreed to arbitrate because they had ratified the arbitration agreement by repeatedly acknowledging the validity of the contract which contained the arbitration clause. In other words, in the cases cited by Alchemy, *there was evidence of an agreement to arbitrate*, regardless of whether the agreement was signed. Here, however, there was *no evidence of an agreement to arbitrate.* In other words, it is not the presence or absence of a *signature* which is dispositive; it is the presence or absence of evidence of an *agreement* to arbitrate which matters.

Furthermore, Alchemy cannot rely on such cases to the extent they turned on an implied agreement to arbitrate based on (1) the parties' previous dealings or (2) conduct from which one could imply either ratification or implied acceptance of such a provision. Here, there was no evidence that Alchemy and Banner had any previous dealings in which they had agreed to arbitrate, or had arbitrated any disputes, nor is there any indication that Alchemy performed its part of the parties' agreement (that Alchemy would go to the film festival and market the Films) in reliance on Banner's apparent acceptance of, or acquiescence in, the arbitration provision contained in the April 16, 1996, draft agreements. As noted above, the uncontroverted evidence showed that Banner and Alchemy came to the agreement

which resulted in Alchemy's marketing the Films at Cannes *before* Alchemy sent Banner the April 16, 1996, draft agreements, and Alchemy presented no evidence that the arbitration provision had been discussed, let alone agreed upon, in connection with that agreement. Furthermore, the fact that Cline, Banner's legal counsel, made no marginal notes objecting to or raising concern about the arbitration provision is meaningless, given that the uncontroverted evidence showed that both parties expected that assent to such provisions (as well as to the April 16, 1996, draft agreements as a whole) would be *expressly* manifested by Banner's execution and return of the draft agreements to Alchemy.

## DISPOSITION

The alternative writ is discharged. The petition for a writ of mandate is granted. The stay order heretofore issued will be lifted upon issuance of the remittitur by this court. The matter is remanded to the trial court with directions to vacate its order granting Alchemy's petition to compel arbitration, to enter an order denying that petition, and to conduct any further proceedings which may be required in a manner not inconsistent with the views expressed herein. Banner shall recover its costs in this writ proceeding. (Cal. Rules of Court, rule 56.4(a).)

Klein, P. J., and Kitching, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied June 10, 1998.