Filed 7/12/13  Bonnigson v. Bonnigson CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| KATHLENE A. BONNIGSON, | |
| Plaintiff and Respondent, | E053237 |
| v. | (Super.Ct.No. RIP094670) |
| LAWRENCE M. BONNIGSON, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Thomas H. Cahraman, Judge.  Affirmed.

Lawrence M. Bonnigson, in pro. per., for Defendant and Appellant.

Kathlene A. Bonnigson, in pro. per.; Bentler Mulder and Christopher Mulder for Plaintiff and Respondent.

After a half-day court trial, the trial court ruled that an oral settlement negotiated by the parties was a binding contract.  Defendant and appellant Lawrence M. Bonnigson (Lawrence) appeals, contending that there was no binding contract because the parties

1

had only agreed on a settlement amount but had not agreed on the other terms of the settlement agreement, including a hold harmless clause and dismissal of a cross-petition.

I

FACTS

On October 31, 2008, plaintiff and respondent Kathlene A. Bonnigson (Kathlene) and her daughter, Kelsey Craven, filed a petition requesting an accounting of the Theodore M. and Evelyn J. Bonnigson Living Trust dated March 18, 1997. The petition alleged mismanagement of the trust assets by Lawrence both personally and as trustee.[1] It sought removal of Lawrence as trustee, a full and complete accounting of the trust, and other relief. In October 2009, Lawrence filed a cross-petition.

Discovery and settlement negotiations culminated in June 2010, at the scheduled deposition of Lawrence. During that deposition, Lawrence accepted Kathlene's settlement offer of $395,000. As discussed, *post*, Lawrence believed that he was only agreeing to pay $395,000. Kathlene's attorney believed the parties had a binding settlement agreement. Although Kathlene's attorney prepared a written settlement agreement, none was ever signed.

The dispute was eventually submitted to the trial court and heard on November 12, 2010. The trial court found a binding oral settlement for $395,000.

---

[1] Kathlene and Lawrence are siblings. Kelsey Craven is a beneficiary of the trust and is not involved in this appeal. Kathlene and Kelsey are also referred to as petitioners in this opinion.

Accordingly, the trial court entered a judgment requiring Lawrence to pay the sum of $395,000 within 30 days. Upon the receipt of that sum, petitioners were ordered to dismiss their petition with prejudice. Upon filing of that dismissal, Lawrence was ordered to file a dismissal of his cross-petition. The judgment also provided that petitioners were to recover costs.[2]

## II

## STANDARD OF REVIEW

In *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, our Supreme Court described our role as follows: "In reviewing the evidence on such an appeal all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]" (*Id.* at p. 429.) The same is true when the trial court determines the facts after hearing conflicting testimony. (See generally 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 365 et seq., p. 421 et seq.)

---

[2] Petitioners subsequently waived costs, and Lawrence agreed to abandon any contention concerning costs in this appeal.

Respondent cites a more current statement of this enduring principle in *In re Zeth S.* (2003) 31 Cal.4th 396, 405 and *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.

Generally, our role is to apply the law to the facts.  (See generally 9 Witkin, Cal. Procedure, *supra*, § 322, pp. 369-370.)  In this case, for example, the trial court determined the facts, and we apply the law of contracts to those facts.

III

THE TRIAL

At trial, Lawrence testified that he sent petitioners' counsel, Christopher Mulder (Mulder), an e-mail after June 23, 2010, the first day of his deposition.  The e-mail asked for an offer of less than the previously discussed sum of $399,000.  The parties met the next day, June 24, before the deposition was to begin.  At trial, Mulder asked: "Essentially, we offered [that] you would pay three ninety-five to the petitioners and we would dismiss all claims against you; that was your understanding, correct?"  Lawrence answered, "Yes."

Although Lawrence did not accept that offer at that time, the parties decided to cancel the deposition.  Instead, they informally reviewed the evidence that petitioners intended to produce at trial.  While going through the documents, Lawrence raised his hand, caught his breath, and said, "'I'll pay the three ninety-five.'"  Lawrence testified that he assumed that if he paid petitioners, they would dismiss the lawsuit.  Kathlene testified that her understanding of the terms of the settlement were that "my brother would pay $395,000 and that we would be dismissing the petitions against him."  In their

4

trial brief, petitioners stated, "The material terms of this offer were that Respondent would pay Petitioners $395,000 (in total) and Petitioners would dismiss the Petition—this would end the litigation."

The parties then agreed that Mulder would prepare a settlement agreement, and Lawrence would wait to sign it. Instead, Lawrence left and called Mulder a few minutes later. Lawrence then left a voicemail message for Mulder, which said that he "repudiated" the offer until he had the chance to review it with his attorney. Mulder recalled that they had a telephone conversation: "I absolutely remember that his reasoning was he wanted to show the settlement agreement to an attorney he had been consulting with. And I had no problem with him showing a settlement agreement to an attorney that he had been consulting with."

Subsequently, Mulder sent Lawrence a proposed seven-page settlement agreement. Mulder's e-mail said: "Attached is the settlement agreement. It contains the provisions we agreed on in principle—namely the amount ($395,000) you pay to the Petitioners, they give you a release of all claim[s] and right to the Bonnigson and McMillan Trusts, you take all responsibility for debt and claims against the Trust by any other party (creditors, taxing agencies, etc.)."

None of the latter provisions had been discussed on June 24. For example, the proposed agreement provided that petitioners would not be liable for any trust liabilities, and that Lawrence would indemnify them from any such liabilities. It further provided that petitioners would not be responsible for tax liabilities, and that Lawrence would be responsible for all such liabilities. It also provided that "Larry shall deliver to Kathlene

5

the cremains of Evelyn Jean Bonnigson at the same time the settlement draft is delivered."

Mulder testified that various versions of the settlement agreement were subsequently exchanged. None were ever signed.**3**

Lawrence argued that because of the extra terms, there was "no meeting of the minds" and, therefore, no settlement agreement. He stated that he was concerned about several proposed terms of the trust and especially the tax provisions.

The trial court responded: "Clearly, this document in Paragraph 17 and 18 added some terms that might have been advantageous to the clients of Mr. Mulder, and I didn't hear anything about those terms being in the oral agreement reached the day—the same day or the day before." The trial court then tentatively concluded "that there was a meeting of the minds on the $395,000 being paid by you in exchange for a dismissal of the claims set forth in this case." After further discussion, the trial court adopted the tentative opinion set forth, *ante*.

IV

DISCUSSION

Lawrence's first argument is that "[a]lthough my sister and I had agreed upon a settlement figure, I had not agreed to a 'hold harmless' clause in the agreement submitted for my signature the following day."

---

**3**    Mulder testified that the final draft was a "basic settlement agreement." However, it is not in our record.

We agree that the evidence and the trial court's ruling clearly supports this assertion.[4] There was substantial evidence of an oral agreement and no evidence that a written settlement agreement was ever signed. The issue is the legal effect of these factual findings.[5]

Lawrence relies on *Greyhound Lines, Inc. v. Superior Court* (1979) 98 Cal.App.3d 604.[6] In that case, Olsen sued Greyhound Lines for injuries she sustained when a Greyhound bus collided with a car in which she was riding. At a settlement conference, she agreed to settle the case for $39,500. (*Id*. at p. 606.) Releases and draft settlement agreements were sent to Olsen, but she refused to sign them, objecting to a proposed hold harmless agreement. (*Ibid*.) Greyhound's counsel testified that the settlement would not have occurred without the execution of the releases. In other words, the releases and the hold harmless clause were integral parts of the settlement agreement. (*Id*. at p. 608.) Accordingly, there was substantial evidence to support the trial court's conclusion that Olsen had not agreed to the terms of the proposed settlement. (*Ibid*.)

---

[4] It is likely that petitioners would also agree to the assertion.

[5] Lawrence also cites *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107. However, the general principles stated there refer to "[t]he rules governing the role of the court in interpreting a written instrument . . . ." (*Id*. at p. 1125.) Here, there was no written instrument to interpret.

[6] *Greyhound Lines, Inc. v. Superior Court*, *supra*, 98 Cal.App.3d 604, was decided in 1979, prior to the enactment of Code of Civil Procedure section 664.6 in 1981. Certain aspects of the case may have been superseded by the adoption of that statute. (See *Mancina v. Hoar* (1982) 129 Cal.App.3d 796, 801, which was itself held to be superseded by the statute in *Corkland v. Boscoe* (1984) 156 Cal.App.3d 989, 993.) The expedited procedures of section 664.6 are not involved in this case.

7

Lawrence contends that the same is true here, i.e., the terms of the settlement agreement were an integral part of the contract. There is no evidence in this case, however, that suggests the terms of the settlement agreement here were an integral part of the agreement.

As the trial court found, based on the testimony, the parties only agreed to settle the case for $395,000. They assumed that the agreement would be reduced to writing. It can be inferred, from the fact that the writing was going to be prepared within an hour and a half and signed on the same afternoon, that it was contemplated to be a very brief document.

In any event, the terms of the settlement agreement were not otherwise discussed, and there was no evidence that any such terms were part of the oral agreement. The fact that there were extensive further negotiations over the terms of the settlement agreement also indicates that the terms were not fixed or even considered at the time of the oral agreement.

Lawrence mischaracterizes his statement that he would settle for $395,000 as an offer. The record shows that the offer was made earlier by petitioners, and Lawrence accepted that offer. There was, therefore, an oral agreement at that time, based on the assumption of the parties that the payment would end the litigation.

Lawrence relies on *Apablasa v. Merritt & Co*. (1959) 176 Cal.App.2d 719. In that case, a series of letters between the parties was found to be too vague and uncertain to constitute a contract. (*Id*. at p. 722.) The case cites the statutory truisms: "It is fundamental that without consent of the parties, which must be mutual [citation], no

8

contract can exist [citation].  Consent cannot be mutual unless all parties agree upon the same thing in the same sense [citation]." (*Id*. at p. 726, citing Civ. Code, §§ 1565, 1550, 1580.)  From this foundation, the opinion cites the well-established rule that the acceptance must exactly match the offer.  If not, it is merely a counteroffer.  (*Apablasa v. Merritt & Co*., at p. 726.)

In the present case, the acceptance ("'I'll pay the three ninety-five'") was unequivocal and was not a qualified acceptance.  We therefore agree with the trial court that an oral agreement was reached at that time.

Nevertheless, Lawrence argues that the terms of the settlement document to which he had not agreed were merely a counteroffer by petitioners.  We disagree.  First, as discussed, *ante*, the offer was made by petitioners, and Lawrence accepted the offer without reservation.  Second, the argument assumes that the terms of the draft settlement document were material terms.  We find no evidence supporting this argument.

Lawrence cites *Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348.  In that case, the issue was whether the parties had entered into an enforceable agreement to arbitrate.  (*Id*. at p. 351.)  The court found there was no such agreement.  (*Ibid*.)  In a section entitled "*General Principles of California Contract Law*," the court said:  "(4)  When it is clear, both from a provision that the proposed written contract would become operative *only* when signed by the parties as well as from any other evidence presented by the parties that both parties contemplated that acceptance of the contract's terms would be signified by signing it, the failure to sign the agreement means no binding contract was created.  [Citations.]  This is so even though the party

9

later sought to be bound by the agreement indicated a willingness to sign the agreement. [Citation.] On the other hand, if the respective parties orally agreed upon all of the terms and conditions of a proposed written agreement with the mutual intention that the oral agreement should thereupon become binding, the mere fact that a formal written agreement to the same effect has not yet been signed does not alter the binding validity of the oral agreement. [Citation.] [¶] (5) Whether it was the parties' mutual intention that their oral agreement to the terms contained in a proposed written agreement should be binding immediately is to be determined from the surrounding facts and circumstances of a particular case and is a question of fact for the trial court. [Citations.] Evidence as to the parties' understanding and intent in taking what actions they did take is admissible to ascertain when or whether a binding agreement was ever reached. [Citations.]" (*Id.* at pp. 357-358.)

The trial court here proceeded to determine that the parties possessed the mutual intent to settle the case for Lawrence's payment of $395,000 in return for petitioners' dismissal of the action. Its implied finding, which is fully supported by the evidence, is that the terms of the settlement agreement (which had not yet even been written) were not a material term of the contract.

Lawrence also argues that the trial court should not have required him to dismiss his cross-petition as part of the judgment. However, as the trial court noted, there was testimony from both sides that they just wanted to put an end to the litigation. The trial court said: "There's no doubt in my mind that everybody thought the whole case was settling for the amount of money that was discussed, and that the contract applied to all

10

aspects of the dispute." The evidence fully supports the trial court's decision to require Lawrence to dismiss his cross-petition.[7]

We therefore conclude that the trial court properly found that the parties reached an oral agreement to settle the litigation for $395,000 in return for dismissal of the litigation, including dismissal of the cross-petition. The judgment on those terms was factually and legally correct.

V

DISPOSITION

The judgment is affirmed. Respondent shall recover her costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>RICHLI</u>_____
                                                J.

We concur:

<u>RAMIREZ</u>_____
                        P. J.

<u>CODRINGTON</u>_____
                        J.

_____

[7] If Lawrence's cross-petition was not dismissed, petitioners would have had to incur the time and expense of preparing for trial in the same manner as if no settlement had been reached. It is highly unlikely that they would have agreed to any settlement that did not include dismissal of Lawrence's cross-petition.

11