Filed 12/8/20  P. v. Onwuka CA4/3

Filed: 12/08/20

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G057923 |
| v. | (Super. Ct. No. 15WF2094) |
| ANDY KEJADI ONWUKA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Cheri T. Pham, Judge.  Affirmed.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

Andy Kejadi Onwuka appeals from a judgment after a jury convicted him of two counts of first-degree burglary and one count of resisting or obstructing a peace officer. Onwuka argues his sentence must be reversed because the trial court punished him for going to trial by imposing a sentence that was nearly double what the court indicated earlier. He also argues the court committed prejudicial error when it refused to allow him to plead guilty prior to and during trial.

We conclude the record does not establish the trial court punished Onwuka for exercising his right to go to trial. We find no error with the court refusing to allow Onwuka to plead guilty prior to or during trial. The judgment is affirmed.

FACTS

An amended complaint charged Onwuka with two felony counts of first degree residential burglary (Pen. Code, §§ 459-460, subd. (a),[1] counts 1 & 2 (Rathburn burglaries)), and misdemeanor resisting and obstructing an officer (§ 148, subd. (a)(1), count 3 (Fox Hills burglary)). It further alleged that pursuant to sections 667, subdivisions (d) and (e)(1) and 1170.12, subdivisions (b) and (c)(1), Onwuka was previously convicted of a serious and violent felony. It further stated he was previously convicted of violating sections 459 and 460, subdivision (a), on or about April 29, 2015. It was also alleged pursuant to section 667, subdivision (a)(1), that prior to the commission of the felony offenses, Onwuka was convicted of violating sections 459 to 460, subdivision (a), a serious felony under section 1192.7 on charges brought separately on April 29, 2015.

I. *Rathburn Burglaries*

On September 21, 2015, a neighbor reported to the Westminster Police Department she had seen two Black men jump over the fence into the backyard of the

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

2

victim's home on Rathburn Avenue.  She described the car they were driving as a dark burgundy sedan and provided a license plate number.  She also reported seeing the suspects come out of the house holding beverage bottles.  She then saw the suspects abruptly drop the bottles and run to and jump over a fence, and out of her sight.  An officer later took the neighbor's statement and brought along one of the suspects for her to view.  The neighbor was unable to make a positive identification.

Approximately one dozen uniformed police officers set up a perimeter around the victim's residence to apprehend the suspects and prevent their escape.  As Officer Alan Aoki and three other officers started moving toward the residence, Aoki saw two men in front of the victim's house walking westbound on the sidewalk.  Both men were wearing clothing similar to the neighbor's description.  One of the suspects was wearing a hat and a suit jacket.  When the two suspects saw the officers, they ran northbound.  Aoki later searched the backyards of the residences along the route taken by two suspects.  He found a dark-colored suit jacket, a short-brimmed felt hat, and a cloth glove in one backyard and a screwdriver behind a different home.  The police confirmed these items did not belong to the residents of those homes.  Inside a pocket of the suit jacket, police found two pieces of gold jewelry.

Officer Malcolm Pierson, who was initially positioned with Aoki, saw two Black men walk casually away from the victim's house down the driveway and walk toward the sidewalk.  Pierson and several other officers drew their firearms and announced they were police officers.  Both suspects turned and fled.  Pierson had an unobstructed view of the suspects and was sure Onwuka was one of the two fleeing men.

Officer Derek Link and another officer were on a walking/bicycle path nearby.  From this location, Link had a direct line of sight to the front door of the victim's residence.  He saw two Black men wearing hoodies, one of whom was Onwuka, emerge through the front door.  One was wearing dark clothing and the other tan clothing.  As

3

they came out of the door, the men were both drinking from bottles. Link watched the two men walk west-bound from the residence on the sidewalk. When Link and the other officer stepped into the street, they saw the suspects drop their beverages, turn around, and run directly towards them. Link drew his firearm and ordered the men on the ground, but the men ignored him. Link watched the men run northbound and jump over a fence and out of his view.

To find the two suspects, the police used a helicopter that was equipped with heat detecting technology. Eventually, officers apprehended and detained both Onwuka and DeAnthony Harris. Officers searched the neighborhood and discovered two bottles on the victim's front lawn, which the victim identified as belonging to him. After searching Onwuka, the officers found jewelry in his pants pocket and a key to a burgundy Mercedes in his jacket pocket. The victim identified the jewelry as belonging to his wife. An officer searching Harris discovered the victim's signed baseball.

Pierson described the interior of the victim's house as being in complete disarray, with broken furniture and property strewn over the floor. Drawers had been removed from cupboards and dumped in the middle of the room. Salad dressing had been poured on the entertainment unit. Pierson determined the bathroom window at the back of the house was the likely point of entry for the burglars because it showed signs of damage and tampering that had not been there before.

The police searched the burgundy Mercedes and recovered a bill of sale bearing the name Andy Onwuka, a social security card in the name of Andy Kejadi Onwuka, and several other items. Suspicious these items had been stolen, advised Officer Miguel Gradilla, who was investigating a burglary that occurred near the Rathburn burglary. Forensic technicians recovered three matching fuzzy, brown gloves from the victim's backyard. The same type of glove had been left on the sidewalk and in the Mercedes.

4

Pierson interviewed Onwuka at the police department. After being advised of his *Miranda*[2] rights, Onwuka agreed to speak with the officer. Onwuka said he lived in Anaheim and was in Westminster because he got lost on his way to Long Beach. He said he was in the vicinity of the victim's residence to pass out cash-for-gold flyers. Pierson asked Onwuka whether he had known Harris before the day of the incident. Onwuka claimed he had encountered Harris for the first time earlier that day at a 7-Eleven near Magnolia Street and Bolsa Avenue and had given him a ride. When asked, Onwuka admitted he owned the burgundy Mercedes, having possession for only two weeks. Onwuka stated he was at the victim's residence only three to four minutes. He knocked and rang the doorbell, but no one answered.

When Pierson showed Onwuka the items recovered from the Mercedes' trunk, Onwuka stated he did not know why those items were there. Onwuka said he had not been able to open the trunk. When Pierson told Onwuka that he found jewelry from the victim's residence in Onwuka's pocket, Onwuka responded he picked the items up off the ground near where his vehicle was parked. Police arrested Onwuka and subsequently charged with first degree burglary of the Rathburn residence.

II. *Fox Hills Burglary*

At 4:40 p.m. on September 21, 2015, Gradilla went to investigate a burglary reported at a residence on Fox Hills Street. The location was about one-half mile from the Rathburn house. After talking to the husband and wife victims, Gradilla conducted a sweep of the house for intruders and walked through the residence with the victims to inventory lost and missing items. The victims reported several missing items including a hot pink colored pouch containing silver coins, a blue pouch that held a pearl necklace, an engagement ring, and a gold watch. The house was in a ransacked

---

[2]     *People v. Miranda* v. *Arizona* (1966) 384 U.S. 436.

condition. Dresser drawers were open and a nightstand next to a bed was dismantled. Gradilla determined a sliding door at the rear of the house was the point of entry based on pry marks on the door and the attached screen.

The victims stated they left their home earlier that day to go to work. When the wife came home about 5:45 p.m., she immediately noticed the front window screens had been removed. Upon entering the house, she noticed items from a cabinet were on the floor. She returned to her car and called the police. After the police ran a safety sweep, the wife reentered the house and saw the front entryway was torn up but "all the bedrooms were pretty much destroyed" with the contents of closets, cupboards, and drawers dumped out. The downstairs bedroom was in a similar condition. The wife noticed her jewelry armoire had been opened and all its contents were gone. When officers showed her photographs of items found in a burgundy Mercedes on Rathburn Avenue, she identified many as belonging to her and her husband. The items she recognized included a white purse, a hot pink bag filled with coins and jewelry, a blue pouch containing pearls, a watch, and two baseballs. Onwuka was charged with first degree burglary of the Fox Hills residence.

III. *Prior Burglary*

At trial, the prosecution asked three witnesses to testify about a previous residential burglary Onwuka committed in 2014. On June 21, 2014, officers received a report of a residential burglary on South Cabernet Circle. When the officer arrived, Onwuka was running and jumping fences, but was being tracked by the police helicopter. Onwuka was captured by police officers after he jumped over a block wall between two residences. Onwuka gave a Mirandized statement, in which he told the officer he ran because he heard someone yell, "They have a gun." The victim of the South Cabernet Circle burglary positively identified Onwuka as being in his home. Onwuka entered the residence by removing a window screen and breaking the glass with a brick. He left

6

several of the rooms were in disarray, with items of personal property thrown about. Officers found a screwdriver and a pair of gloves in the residence.

IV. *Defense Case*

Onwuka testified on his own behalf. When asked if he pleaded guilty to the 2014 burglary because he was guilty in that case, he responded, "'Well, I think so.'" He admitted going into a house on Rathburn with Harris in September 2015. He explained the reason he entered the home was because Harris told him someone there had taken his drugs and he wanted to get his "weed" back. Their plan was to look around for the "weed," take it, and leave. He testified he did not remember seeing the pictures shown during trial depicting the ransacked interior of the house. He denied putting things in his pockets that did not belong to him. He testified that when he came out of the house, he had a bottle of orange juice in his hand. He saw the police and ran. He said he ran because he knew that he should not have broken into the house.

Onwuka testified that in September 2015 he possessed but did not own a burgundy Mercedes. Onwuka explained he was in Westminster that day to go to the Department of Motor Vehicles. Onwuka said he was in Westminster only 10 minutes before going to the Rathburn house. He denied going to Fox Hills Street. Regarding the items that were found in the trunk of the Mercedes, Onwuka said Harris placed them there after Onwuka opened it for him. Onwuka denied officers found anything in his pockets when he was arrested. He denied having the key to the Mercedes in his pocket and claimed he put it on the floor when he saw the police. Onwuka denied making statements when questioned by Pierson at the police department.

7

V. *Plea Discussions*

In December 2017, Onwuka was representing himself.[3] The trial court asked Onwuka if he wanted a plea offer from the prosecution. Onwuka indicated he would like to hear the prosecution's offer. The prosecution calculated the maximum sentence on all of Onwuka's cases would be 26 years. The court concurred and indicated that if it struck Onwuka's strike allegation for sentencing purposes, the maximum sentence could be reduced to 16 years. The prosecution then proposed a 16-year sentence, which Onwuka turned down. The court asked Onwuka if he would like to hear an offer from the court and he said he would. The court offered eight years and clarified the sentence would run concurrent with a six-year probation violation sentence imposed by another judge. The court indicated it felt it had made what it considered "a very generous offer." Onwuka turned down the court's offer.

On April 4, 2019, Onwuka stated he did not want his current counsel to continue to represent him and he was going to ask his uncle to hire private counsel for him. He hoped his new attorney would be present the following Monday. The court denied Onwuka's request for a continuance to seek new counsel. Onwuka became very obstreperous and had to be removed from the courtroom. Without Onwuka in the courtroom, his counsel advised the court she spoke with her client and he was very agitated. Counsel stated she could not have a fruitful discussion with Onwuka in court and she asked for an opportunity to discuss various issues with Onwuka, including a plea offer, at the jail. Her plan was to take a supervisor or colleague with her to facilitate

---

[3] Judge Derek Johnson first granted Onwuka pro per privileges on November 12, 2015. On February 5, 2018, Judge Lance Jensen revoked Onwuka's pro per status based on "the defendant's history of obstructionist behavior, which threatens to subvert the core concept of a trial and/or compromise the court's ability to conduct a fair trial and his unwillingness to abide by directions and/or orders from the court." The court appointed the Alternate Public Defender.

8

conversation with Onwuka. Counsel asked if the matter could be trailed until the following Monday and the court agreed. The court noted it was granting the delay for the benefit of counsel. The court indicated it had a history with Onwuka's case for almost three years. The court opined it was blatantly obvious to the court that Onwuka did not want to go to trial and his latest outburst was merely another delaying tactic.

The following Monday, April 8, 2019, Onwuka returned to the courtroom with his counsel. Both sides announced ready for trial, but Onwuka's counsel asked if she could pose a couple of questions to the court on Onwuka's behalf. Onwuka's counsel advised the court Onwuka was again requesting time to hire private counsel, and if that was denied, he wanted to represent himself. The court again denied the request "because the [c]ourt finds that this is another dilatory tactic to delay this trial even further." The court continued, "And, on that note, I will state for the record the history of this case. As Judge Jensen made findings and ruled on February 5th, 2018, . . . Onwuka has, quote, '. . . engaged in a long and extensive history of dilatory practices. The record is abundantly clear that [Onwuka] is doing everything he can to delay the process of having his jury trial. Based on the totality of the circumstances, this [c]ourt,' meaning Judge Jensen, 'has no confidence that this case will go to trial.'" The court noted as a result of Judge Jensen's conclusion Onwuka was engaging in dilatory practices, he revoked Onwuka's pro per status and appointed counsel. The court also stated the previous Thursday, after the court denied the motion to continue, Onwuka made another request to supplement his *Marsden*[4] motion. When the court denied that request, it stated, "Onwuka refused to stop talking at that point, refused to follow the [c]ourt's direction to stop talking and interrupting the [c]ourt, ultimately resulting in his removal from the courtroom[.]" The court observed it had granted counsel's request to trail the matter until Monday to allow

---

[4]     *People v. Marsden* (1970) 2 Cal.3d 118.

9

for consultation over the weekend with Onwuka at the jail. The court denied Onwuka's "request to fire" his counsel. The court indicated it would not conduct another *Marsden* hearing because it was confident Onwuka had no new or additional grounds that "even justify the [c]ourt considering your request to fire [counsel]." Onwuka argued his new grounds related to the plea bargaining process. The court told Onwuka that he could either accept the offer the prosecution had made or the offer the court had made. The court made it clear there was not going to be a better offer. Onwuka continued to reargue issues the court had already ruled on, and the court ultimately interrupted him and said the case was going to trial.

On April 9, 2019, jury selection began. The following day, Onwuka's counsel indicated she had discussed a guilty plea with Onwuka, but everything fell apart when counsel advised Onwuka it had to be a "package deal" that disposed of all of his cases. Onwuka did not want to plead guilty to one misdemeanor case so he could continue to have pro per privileges. He also suggested he could post bail on the misdemeanor, apparently thinking this would mean he could be released from custody despite the guilty pleas on the felony counts. The court told him that if he pleaded guilty, he would not be granted bail. Onwuka continued to talk about pro per privileges, waiving sentencing, and other desired outcomes. At that point, the court told Onwuka he and the court did not have an understanding as to what the court's offer was. The court reiterated its offer and indicated it would not allow pro per privileges to continue if Onwuka took the court's deal. The court concluded by saying, "And so if you are trying to change that offer, then we have no deal." The court then brought the jury in, apologized for the delay, and a witness testified.

On April 11, 2019, the prosecution called its last witness and the defense began its case. At the conclusion of the day, the court began addressing the prosecution exhibits, and inquiring how many more witnesses the defense expected to call. When the

10

court announced it was recessing for the evening, Onwuka spoke up. He said he wanted to plead guilty. A discussion ensued, during which Onwuka asked about making telephone calls before being transferred to prison and other matters collateral to the plea. When Onwuka stated he needed more time to think about how he wanted to proceed, the court indicated there was another problem. It indicated a guilty plea could only be accepted if Onwuka felt he was truly guilty and not because he felt he was being forced to plead guilty. The court indicated it would not be a voluntary plea if Onwuka felt "somehow forced into it, by either your attorney, by me, by the court system, by the bailiffs, the [prosecution]. That's not a voluntary plea." Onwuka responded saying he was "constitutionally innocent."

Onwuka then began to explain what he considered to be untrue including evidence of items being found in his pocket, and he denied he made the Mirandized statements attributed to him. He expressed a desire to tell his side of the story, stating the following: "[W]hat they did and what I didn't do. And then, after that, if they still want to give me the same deal, then I was just going to take the deal and plead guilty to everything. I just wanted to tell the misconduct." Counsel then attempted to clarify Onwuka's position. She stated Onwuka knows he is guilty of the offenses, but he does not agree with the characterization of the witness testimony. The court responded saying, Onwuka just denied having the victim's property in his pocket. The court continued to try and determine whether there was a factual basis for a guilty plea to no avail. Onwuka repeatedly responded to the court's questions with his own questions. The court finally indicated it was "done" and recessed for the evening.

At the next session, counsel again advised the trial court Onwuka wanted to plead guilty, and the court indicated it did not believe it could accept a waiver from Onwuka or a guilty plea after its conversation with him before the court last recessed. The court explained, "He expressed very clearly that he does not feel he is guilty of these

11

charges. He is only pleading guilty to avoid more time. And if he says anything different today, it would be, I believe, insincere."

Onwuka began explaining he always wanted to plead guilty but because of the police misconduct he should not be found guilty. When the court asked about the police misconduct, he explained "like picking the key up off the ground and saying it was in my pocket." More conversation ensued between the court and Onwuka regarding his admission of guilt, but Onwuka continued to dispute his guilt. The court ultimately concluded Onwuka was unwilling to admit his guilt. The court explained Onwuka did not truly believe he was guilty. He was attempting to plead guilty because he felt forced to do so and felt he was being railroaded by the court, by his lawyer, by the prosecution, and by the system. The court stated it was "not in the business of taking involuntary pleas."

After the jury returned its verdicts but before sentencing, Onwuka made a motion to relieve his attorney and represent himself at sentencing. The count indicated it had no doubt Onwuka was competent to represent himself, but the court was going to deny his request. The court explained Onwuka was only requesting to represent himself for sentencing after the court denied his fourth motion to "fire" his counsel. The court said it could not consider Onwuka's request as an unequivocal request to represent himself. The court indicated when deciding to allow a defendant to represent himself or herself, the court must determine whether a defendant is and will remain disruptive, obstreperous, disobedient, disrespectful, or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation. The court stated Onwuka had represented himself for three years on this case and it cited the numerous instances where Onwuka had been "'disruptive, obstreperous, disobedient, disrespectful, and [an] obstructionist.'"

12

The court cited all eight times Onwuka had refused to be transported from the jail for court. It then described Onwuka's disruptive behavior throughout his stay at the jail. The court noted Onwuka had also committed new offenses while imprisoned.

The court added that because of Onwuka's disruptive, obstreperous, disobedient, disrespectful, and obstructionist behavior, his right to represent himself was terminated by Judge Jensen on February 5, 2018. The court commented Onwuka's behavior did not change after he was appointed counsel in this case. The court said it had observed this during the jury trial. It indicated the record was clear as to all of Onwuka's antics in court. The court described Onwuka's behaviors as "including, but not limited to, whistling during the reading of the pretrial instructions to the jury, refusing to dress out for court, refusing to have his chains removed, pretending to sleep or actually sleeping during trial, and not responding to the court's questions." Finally, the court concluded the latest request to self-represent was nothing more than another attempt by Onwuka to delay the proceedings. Based on the entire record and history of the case, the court indicated it had no confidence Onwuka would be ready to proceed with his sentencing on June 21, 2019, or on any other date. "To grant his request to represent himself would undermine the [c]ourt's ability to administer justice in a lawful and expeditious manner." The court denied Onwuka's request to represent himself.

VI. *Sentencing Hearing*

At the sentencing hearing, the trial court stated it reviewed a 26-page probation and sentencing report, and Onwuka's handwritten statement. The court also stated it reviewed the parties' sentencing briefs and an e-mail it received that morning from Onwuka's uncle. Defense counsel asked that the statement Onwuka engaged in "'violent'" conduct be stricken from the report, and the court granted that request. Defense counsel argued Onwuka was a teenager when he committed the strike offense. She contended the six years he received for his first offenses was harsh. She requested a

13

sentence of double the midterm and acknowledged the court was going to double the midterm based on the strike, but asked the court to strike the five-year prior. Counsel stated it "still sort of pains me to be requesting [10] years, but I just hope that the [c]ourt sees that as a very serious punishment." Onwuka's uncle, Dr. Oxford Onwuka, addressed the court. He testified he lives in New York and offered his sincere apology for his nephew's disruptive behaviors. The uncle indicated Onwuka had family support and requested leniency.

Initially, the trial court determined Onwuka was statutorily ineligible for probation pursuant to section 667, subdivision (c)(2), because he was previously convicted on a strike prior. The court added that even if Onwuka were statutorily eligible for probation, it found he was not a suitable candidate for reasons listed in California Rules of Court, rule 4.414. Regarding the facts relating to the crime, the court determined "Onwuka was an active participant in both residential burglaries in that he drove himself and [his companion] to the victims' residences in his car, entered both residences, and stole and possessed property stolen from both victims' residences." As Onwuka was on probation when he committed the crimes, it also found his prior performance while on probation unsatisfactory. Despite Onwuka's expressed willingness to comply with probation as indicated in the probation report, the court was not convinced "in light of his unsatisfactory performance on probation and his extensive history of rule violations while incarcerated in . . . jail awaiting trial on this case." The court noted it had considered the general objectives in sentencing as set out in California Rules of Court, rule 4.410 and in section 1202.7. The court denied probation.

The trial court sentenced Onwuka to a total term of 13 years on count 1. The court sentenced Onwuka to the midterm of four years, doubled to eight years pursuant to section 667, subdivision (e)(2)(C), because of his prior serious and/or violent felony conviction. The court explained it contemplated the midterm because it found that

14

neither aggravating circumstances, nor mitigating circumstances, prevailed. As to the section 667, subdivision (a)(1), prior, the court declined to exercise its discretion to strike the sentence enhancement. It explained the prior conviction was too recent and it was obvious Onwuka "did not learn his lesson after committing the first residential burglary but continued to brazenly break into other people's homes during the day while the victims were not home, ransacking their homes, in one residence even pouring salad dressing over the [television] and furniture and stealing their property." The court concluded, "[o]n these facts, striking the five-year prior conviction would not be in the interest of justice." The court then imposed an additional five years for the prior serious felony conviction.

As to count 2, the trial court sentenced Onwuka to one-third of the midterm, doubled pursuant to section 667, subdivision (e)(2)(C), because of his prior serious and/or violent felony conviction, for a total of two years and eight months consecutive to the sentence on count 1. The court explained the consecutive sentence was contemplated because it had considered the criteria set out in California Rules of Court, rule 4.425 and found "the crimes in counts 1 and 2 and their objectives were predominantly independent of each other, and that these crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior."

As to count 3, the trial court sentenced Onwuka to one year, to be served concurrent to any other sentence. The total aggregate sentence was 15 years, eight months in prison to run concurrent with his probation violation sentence.

After explaining its tentative sentencing decision, the court asked counsel if either wanted to be heard further and both indicated they did not. The court then adopted its tentative finding and sentence.

15

Onwuka claims the court punished him for going to trial by imposing a sentence nearly double what the court previously offered in exchange for a guilty plea, and the court committed prejudicial error when it refused to allow him to plead guilty prior to and during trial. The Attorney General argues Onwuka forfeited his claims because he failed to object at sentencing. This argument has surface appeal, but to avoid the inevitable ineffective assistance of counsel habeas corpus petition, we address the merits. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 92.) We will discuss each of Onwuka's claims in turn.

I. *Punishment for Going to Trial*

Onwuka asserts, and the Attorney General agrees, a state may not penalize a person for the exercise of a constitutional right. (*Dunn v. Blumstein* (1972) 405 U.S. 330, 341-342.) He cites *In re Lewallen* (1976) 23 Cal.3d 274 (*Lewallen*), and *People v. Collins* (2001) 26 Cal.4th 297 (*Collins*), in support of his argument the court punished him for exercising his right to trial. In *Lewallen*, our Supreme Court focused on two comments by the trial court. First, in response to defense counsel's suggestion that placing the defendant on informal probation would suffice, the trial court responded, "'You mean whether or not there's a disposition or not after a jury trial?' Second, after sentencing the trial judge stated, 'I think I want to emphasize there's no reason in having the [d]istrict [a]ttorney attempt to negotiate matters if after the defendant refuses a negotiation he gets the same sentence as if he had accepted the negotiation. It is just a waste of everybody's time, and what's he got to lose. And as far as I'm concerned, if a defendant wants a jury trial and he's convicted, he's not going to be penalized with that, *but* on the other hand he's not going to have the consideration he would have had if there was a plea.'" (*Lewallen*, *supra*, 23 Cal. 3d at p. 280.) The Supreme Court found the petitioner had established the trial court's exercise of its discretion was improperly

influenced by the defendant's refusal to accept the proffered plea bargain. (*Id*. at p. 277.) No such statements exist in this record.

The *Lewallen* court also emphasized "a trial court's discretion in imposing sentence is in no way limited by the terms of any negotiated pleas or sentences offered the defendant by the prosecution. The imposition of sentence within the legislatively prescribed limits is exclusively a judicial function. [Citation.]" (*Lewallen*, *supra*, 23 Cal.3d at p. 281.) Although a court may not impose a sentence that conflicts with a defendant's exercise of his constitutional right to a jury trial, "under appropriate circumstances a defendant may receive a more severe sentence following trial than he would have received had he pleaded guilty; the trial itself may reveal more adverse information about him than was previously known." (*Ibid.*) "Legitimate facts may come to the court's attention either through the personal observations of the judge during trial [citation], or through the presentence report by the probation department, to induce the court to impose a sentence in excess of any recommended by the prosecution." (*Ibid.*) Here, the court gave a very detailed explanation for its sentencing choices and nothing in the record suggests Onwuka was punished for exercising his right to go to trial. On appeal, the defendant must show the higher sentence was imposed as punishment. (*People v. Angus* (1980) 114 Cal.App.3d 973, 989-990.). Onwuka has made no such showing.

In *Collins*, the question before the Supreme Court was the validity of the defendant's jury trial waiver. Prior to defendant waiving his right to a jury trial, defendant indicated he was told the jury waiver would result in an unspecified benefit. (*Collin, supra,* 26 Cal.4th at p. 300.) The court responded, "Okay. I think that—I think what [defense counsel] may have been referring to is that *I indicated to counsel when somebody mentioned that this issue is going to be discussed with you that there might well be a benefit in it. Just by having waived jury, that has some effect on the court. Do*

17

*you understand that? By not taking up two weeks' time to try the case, but rather giving—just having it in front of a judge alone. . . . Do you understand that?*" (*Id*. at p. 302.) The defendant subsequently waived his right to a jury trial. After the court convicted him, defendant appealed claiming his jury waiver was not voluntarily made because it was induced by an offer of benefit from the court. (*Id*. at pp. 302-303.) Although the court did not specify the nature of the benefit, the Supreme Court found there was an inducement offered by the trial court to defendant, to persuade him to waive his fundamental right to a jury trial. This inducement violated defendant's right to due process of law. (*Id*. at p. 309.) We find *Collins* inapposite. Here, by contrast, the court did not attempt to persuade Onwuka to waive his right to a jury trial, to go to trial, or to plead guilty. Nothing in the record suggests the court violated Onwuka's due process rights.

In his reply brief, Onwuka again asserts he was punished for going to trial. He describes the scenario as "A sweetheart deal, a warning and then a punishing sentence." He argues that although the court did not explicitly indicate it would punish him, "the totality of the court's actions and comments viewed in context indicate" that is what happened. The court's offer may have been "[a] sweetheart deal," half of the sentence offered by the prosecution, but we disagree the court punished him for going to trial.

Onwuka suggests "virtually all the relevant sentencing facts" were known to the court before the start of trial. Not so. Legitimate adverse information developed and came to the court's attention once trial began. Onwuka's incredible self-serving testimony, as well as the probation report and other materials prepared for sentencing, came after the court's plea offer. The probation report stated Onwuka committed 89 major rule violations, many of which occurred after trial began. The court recited for the record the offensive behavior Onwuka engaged in during trial and right up until

18

sentencing was imposed. The court also read the sentencing report and indicated it did not find Onwuka's statements genuine. Furthermore, even if the court was generally aware of Onwuka's criminal history and jail violations at the time of the plea offer, it would not have known all the details provided at the sentencing hearing. These specifics informed the court's understanding of an appropriate sentence, as well as the trial judge's evaluation of the likelihood of recidivism. Indeed, a defendant who violates the rules, shows no appreciation of the seriousness of his conduct, and repeatedly commits perjury is quite rightly viewed as a different kind of risk at sentencing as compared to his first appearance before the trial court.

Onwuka's recitation of isolated comments from the court are out of context and do not reflect the entirety of the discussions between him and the court. These comments do not establish the court punished Onwuka for going to trial. The court's pre-conviction offers do not constrain the trial court's sentencing discretion. A defendant must make some showing the court imposed a longer sentence to punish the defendant for exercising his right to a jury trial. (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 762.) The mere fact a defendant received a more severe sentence after a jury verdict of guilty is not evidence that the sentence is vindictive. (*Ibid.*) Here, the court imposed a longer term after being provided with new, more detailed information at the time of sentencing. We find no error.

II. *Failure to Accept Guilty Plea*

Onwuka asserts the trial court's rejection of his guilty plea was prejudicial error. He claims it was his difficulty in "admitting his involvement in the burglaries [that] ultimately" prevented the plea, and argues this was error because a personal admission of guilt is not required. He cites *Brady v. U.S.* (1970) 397 U.S. 742, for the proposition a defendant, after voluntarily, knowingly, and intelligently waiving his constitutional rights, may enter a plea to avoid more severe punishment. Onwuka notes

19

in *People v. West* (1970) 3 Cal.3d 595, 608, our Supreme Court found that although the guilty plea was a product of an understanding of a lesser sentence, the plea was both voluntary and free from constitutional infirmity. Onwuka cites additional cases for the proposition a defendant can enter a valid guilty plea without a personal belief in his innocence.

Clearly, the trial court made every effort to determine whether there was a factual basis for the plea since Onwuka disputed his guilt. After stating he always wanted to plead guilty, Onwuka said he should not be found guilty because of the police misconduct. Onwuka challenged the evidence against him and suggested the police had fabricated evidence. He claimed the police lied about a variety of things, including what they observed him doing, where evidence had been found, and about him making statements to Pierson at the police station. But Onwuka's ambivalence about his guilt was not the only reason the court was disinclined to accept a plea from Onwuka.

In addition to his claim of innocence, Onwuka repeatedly attempted to change the terms of the trial court's offer. He did not want to accept the court's "package deal" and plead guilty on all cases because he wanted to retain his pro per privileges and suggested he planned to bail out of custody. The court reiterated the offer it was making, but Onwuka did not indicate any willingness to accept the offer as framed by the court. We agree with the court, there was no "deal."

"[A] plea agreement is interpreted according to the same rules as other contracts. [Citation.]" (*People v. Toscano* (2004) 124 Cal.App.4th 340, 344.) Here, the plea agreement was essentially a contract between the defendant and the court. But Onwuka refused the court's offer and the court did not accept any of Onwuka's counteroffers. "[T]he failure to reach a meeting of the minds on all material points prevents the formation of a contract *even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract.*" (*Banner*

20

*Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348, 359.) There was no meeting of the minds here. Onwuka's random thoughts and musings did not amount to an acceptance of the court's offer.

Towards the end of trial, there were more back and forth discussions between Onwuka and the court. It was at this point the court voiced further concern with respect to voluntariness if there was going to be a guilty plea. The court concluded Onwuka was attempting to plead guilty because he felt he was being forced. The court indicated it would not be a voluntary plea if Onwuka felt he was "somehow forced into it." A guilty plea must be "'"'"the product of a free and deliberate choice rather than intimidation [or] coercion[.]'"'"'" (*Collins*, *supra*, 26 Cal.4th at p. 305.) "When a criminal defendant enters a guilty plea, the trial court is required to ensure that the plea is knowing and voluntary. [Citation.]" (*People v. Cross* (2015) 61 Cal.4th 164, 170.) In the event of a guilty plea, "the record must demonstrate that the defendant voluntarily and intelligently waived his constitutional trial rights." (*People v. Farwell* (2018) 5 Cal.5th 295, 300.) Onwuka's various comments regarding his motivation to plead guilty prevented the court from making the requisite finding he was entering the plea and waiving his rights voluntarily and intelligently. The court committed no error by declining to accept a plea it found lacking in voluntariness.

We do not dispute Onwuka's contention an admission of guilt is not necessarily required for a guilty plea. This, however, was just one of the reasons the trial court declined to accept Onwuka's plea. There never was a meeting of the minds with respect to the conditions of the sentence. There was simply the court's offer, and Onwuka's multiple counteroffers. Even if a meeting of the minds could be discerned from this record, the court's conclusion Onwuka's agreement to plead guilty was not voluntary was supported by the record. We find no error with the court's failure to accept Onwuka's guilty plea.

DISPOSITION

The judgment is affirmed.


                                        O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.