Filed 7/1/24  Helfet v. Motive Energy CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| ANDREW HELFET, | B331359 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 22STCV37392) |
| v. | |
| MOTIVE ENERGY, INC., et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Carolyn B. Kuhl, Judge.  Reversed.

Blank Rome, Natalie R. Alameddine and Nicole N. Wentworth for Defendants and Appellants.

Nosratilaw, Omid Norati, Rene M. Madonado and Sol Nunez for Plaintiff and Respondent.

Appellants Motive Energy, Inc., Motive Energy Telecommunications Group, Inc., Motive Energy Storage Systems, Inc., Motive Energy, LLC, and Advanced Charging Technologies, Inc. (collectively, Motive), along with appellants Robert J. Istwan, Leonard Stein, and Larry Snegg,[1] appeal from an order denying their motion to compel respondent Andrew Helfet, a former Motive employee, to arbitrate his claims against them. The court denied the motion on two bases: (1) that the defendants failed to prove the existence of an agreement to arbitrate, because only Helfet—and not Motive—signed the agreement; and (2) even if an agreement to arbitrate existed, it is unenforceable because it is permeated by unconscionable provisions that cannot be severed.

We conclude the court reversibly erred in concluding that no agreement to arbitrate existed, and in concluding that the agreement contained multiple unconscionable provisions. The court correctly concluded that one term, which entitled the prevailing party in arbitration to recover its costs and attorney fees, was unconscionable. The court, however, abused its discretion in concluding that the unconscionable provision could not be severed. Accordingly, we reverse.

---

[1] On the few occasions that we refer to the larger group of defendants that comprise the appellants in the instant matter— i.e., both the individual defendants and Motive—we use the term "defendants."

# FACTS AND PROCEEDINGS BELOW

### A. *The Disputed Agreement*

Helfet is a former employee of Motive, a company providing telecommunications services to consumers. During Helfet's new employee orientation and onboarding process at Motive, company personnel presented Helfet with a stand-alone document entitled "Employee Confidentiality and Mutual Arbitration Agreement—California" (the agreement). (Full capitalization omitted.)

The agreement states that it is between Helfet and Motive, referred to in the agreement as "the company." (Capitalization omitted.) Section 19 of the agreement (the arbitration provision) is entitled "Arbitration." It provides, inter alia: "The company is committed to using binding arbitration to resolve all legal disputes, whether initiated by the company or by an employee, in a forum which provides this alternative to the court system. As a condition of employment or continued employment of [Helfet], [Helfet] agrees to use the arbitration forum. The company's agreement to use binding arbitration is confirmed by its signature below; [Helfet]'s agreement is confirmed by [his] signature below or by [his] acceptance or continuation of employment upon notice of this policy. This policy is not subject to unilateral modification or rescission by the company; it may not be modified or rescinded except by a mutual, written and signed further agreement by both the company and [Helfet]. [¶] The company and [Helfet] hereby mutually agree that any dispute or controversy between the parties arising from or in any way related to [Helfet]'s employment with the company, shall be submitted to and determined by binding arbitration under the California Arbitration Act ( . . . Code Civ. Proc.[,] § 1280 et seq.) (hereinafter 'arbitration agreement'). The company and [Helfet]

3

agree, however, that an exception to the arbitration agreement exists for purposes of the company seeking an injunction from any court of competent jurisdiction to enforce this agreement pursuant to section 7 of this agreement." (Capitalization omitted.) Section 7 is captioned "enforcement of agreements" and provides "that a breach or violation by [Helfet] of section[s] 5, 6, and/or 9"—which address the "protection and ownership of" certain proprietary information, "raiding," defined as recruiting or encouraging Motive employees to terminate their employment with Motive, and "inventions/intellectual property rights"—"will cause immediate and irreparable damage to the company which cannot be easily . . . quantified. (Boldface and capitalization omitted.) For that reason, [Helfet] agrees that the company shall be entitled, as a matter of right, to an injunction from any court of competent jurisdiction, restraining any further violation of this agreement. This remedy shall be in addition to any other rights and remedies the company may have pursuant to this agreement or law, including, specifically, the recovery of monetary damages, whether compensatory or punitive." (Boldface & capitalization omitted.) We shall refer to this aspect of the arbitration provision as the "injunctive relief exception."

The arbitration provision clarifies that, other than the injunctive relief exception, the arbitration provision "governs all disputes between the company and [Helfet]," and provides numerous, non-exhaustive examples of the types and nature of such possible disputes. (Capitalization omitted.) The arbitration provision concludes with the following statement: "[Helfet] understands that by agreeing to this binding arbitration provision, both [he] and the company give up their rights to trial by jury." (Capitalization omitted.)

4

The agreement also contains a provision entitled "Costs and Attorneys' Fees," which provides: "In the event of any proceeding, arbitration, or litigation between the parties arising under this agreement, the prevailing party shall be entitled to costs and reasonable attorneys' fees" (the fee-shifting provision). (Capitalization omitted.) Finally, the agreement concludes with signature lines for both "employee" and a "Motive . . . representative." (Capitalization omitted.) Helfet signed the agreement on May 7, 2020 as the "employee." No one signed the agreement on behalf of Motive.

### B. *Helfet's Lawsuit and the Defendants' Motion To Compel Arbitration*

On November 29, 2022, Helfet filed suit against defendants, both on his own behalf and purporting to represent similarly situated employees on a class-wide basis. The operative complaint in the action alleges violations of the Labor Code, the Investigative Consumer Reporting Agencies Act, and the Credit Reporting Agencies Act, and a cause of action under the Private Attorneys General Act. On April 28, 2023, defendants moved for an order dismissing the action and compelling Helfet to submit his claims to binding arbitration on an individual basis, or, alternatively, compelling all arbitrable claims into individual arbitration and staying the non-arbitrable claims pending conclusion of arbitration.

On June 28, 2023, the trial court denied the motion on the bases that (1) defendants had failed to prove the existence of an agreement to arbitrate, because Motive had not signed the agreement, and (2) the arbitration provision was unenforceable in any event, because it contained unconscionable provisions that could not be severed from the remainder of the agreement.

5

Specifically, the court identified as unconscionable the injunctive relief exception and the fee-shifting provision.

The defendants timely appealed.

## DISCUSSION

### A. *The Existence of an Agreement To Arbitrate*

The defendants argue the trial court erred in concluding, based on Motive's failure to sign the agreement, that no agreement to arbitrate existed. Whether a valid agreement to arbitrate was formed is reviewed de novo where, as here, the facts are not disputed.[2] (*Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 173 (*Serafin*).)

In determining whether an unsigned document can support a motion to compel arbitration, "the presence or absence of a *signature* [is not] dispositive; it is the presence or absence of evidence of an *agreement* to arbitrate which matters." (*Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348, 361 (*Banner*).) Because a signature is but one form of such evidence (see, e.g., *id.* at pp. 360–362; *Serafin, supra*, 235 Cal.App.4th at p. 176), "the writing memorializing an arbitration agreement need not be signed by both parties in order to be

---

[2] Helfet contends this is a factual issue subject to substantial evidence review. We disagree. (See *Juen v. Alain Pinel Realtors, Inc.* (2019) 32 Cal.App.5th 972, 978 [rejecting substantial evidence review of the "trial court's conclusion that ' "[t]he language of the provision shows that it was contemplated that both the seller and the broker must agree to arbitration and indicate that assent by writing their initials in the appropriate place" ' " because "[t]he trial court's ruling was based on contract interpretation, not on any disputed facts"], citing *Romo v. Y-3 Holdings, Inc.* (2001) 87 Cal.App.4th 1153, 1158 (*Romo*).)

upheld as a binding arbitration agreement." (*Serafin, supra*, at p. 176.) "Evidence confirming the existence of an agreement to arbitrate, despite an unsigned agreement, can be based, for example, on 'conduct from which one could imply . . . acceptance of such a provision.'" (*Ibid.*) Such conduct includes: (1) the employer having authored the written agreement and printed it on the employer's letterhead (*ibid.*; *Cruise v. Kroger Co.* (2015) 233 Cal.App.4th 390, 398 (*Cruise*)), (2) the employer having presented the agreement to the employee as part of a packet of onboarding materials and requiring the employee to sign it as a condition of employment (see *Lara v. Onsite Health, Inc.* (N.D.Cal. 2012) 896 F.Supp.2d 831, 844 (*Lara*) [applying California law, cited in *Cruise, supra*, at p. 399]), and (3) that an employer-drafted agreement was " 'written in terms of both parties' obligations.'" (*Cruise, supra*, at p. 398; see *ibid.* ["the arbitration clause declared [the employer's] intent to be bound thereby" with language stating that "the company likewise agrees to mandatory final and binding arbitration of any covered disputes"], capitalization omitted.)

Here, Motive's conduct provides strong evidence that Motive consented to the arbitration provision despite its failure to sign the agreement. Motive prepared the agreement and presented it to Helfet as part of his mandatory onboarding paperwork. (See *Serafin, supra*, 235 Cal.App.4th at p. 176; *Cruise, supra,* 233 Cal.App.4th at pp. 398–399; see also *Lara, supra,* 896 F.Supp.2d at p. 844.) The language of the agreement repeatedly refers to a mutual agreement to arbitrate all disputes (except those falling within the injunctive relief exception, a provision discussed further below) and includes several declarations of the company's commitment to arbitration, to

7

wit: "The company is committed to using binding arbitration to resolve all legal disputes." "*The company and* [*Helfet*] *hereby mutually agree* that any dispute or controversy . . . shall be submitted to and determined by binding arbitration." "[Helfet] understands that by agreeing to this binding arbitration provision, *both* [*Helfet*] *and the company* give up their rights to trial by jury." (Capitalization omitted & italics added.) (See *Cruise, supra,* at p. 399; see also *Lara, supra,* at p. 844.)

Helfet argues that this conduct does not support an agreement to arbitrate because the arbitration provision itself provides that both parties must sign in order to agree to its terms. In so arguing, he relies on cases establishing that "[w]hen it is clear . . . from a provision that the proposed written contract would become operative only when signed by the parties . . . [and/or] from any other evidence presented by the parties that both parties contemplated that acceptance of the contract's terms would be signified by signing it, the failure to sign the agreement means no binding contract was created." (*Banner, supra*, 62 Cal.App.4th at p. 358, italics omitted; see *Marcus & Millichap Real Estate Investment Brokerage Co. v. Hock Investment Co.* (1998) 68 Cal.App.4th 83, 91 (*Marcus*) & *Romo, supra,* 87 Cal.App.4th at p. 1160.) He argues this rule applies here based on the following agreement language: "The company's agreement to use binding arbitration *is confirmed by its signature below*; [Helfet]'s agreement *is confirmed by* [*Helfet*]*'s signature below or by* [*Helfet*]*'s acceptance or continuation of employment upon notice of this policy*." (Italics added.)

We disagree that this language precludes the company from assenting to the arbitration provision by some means other than signing the agreement. Rather, we read this to

mean Motive's signature on the broader agreement "confirm[s]" a commitment to arbitrate that Motive attests to without qualification elsewhere in the document. This interpretation is guided not only by the specific language of the agreement— the use of the word "confirm," which we agree with defendants connotes a previously established agreement—but also by the agreement as a whole, including its multiple references to Motive's commitment to arbitration, and by Motive presenting the agreement as a non-negotiable prerequisite to employment, then employing Helfet after he signed it. (See *Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416, 420–421 ["a party's acceptance of an agreement to arbitrate may be . . . [citations] . . . implied-in-fact where, as here, the employee's continued employment constitutes her acceptance of an agreement proposed by her employer"].)

For these reasons, we conclude that the agreement did not require Motive's signature as the only means of assenting to the arbitration provision, and that Motive's failure to sign the agreement does not signify Motive did not assent to the arbitration provision.[3]

---

[3] Helfet echoes the concerns of the trial court and argues that, if we conclude " 'an agreement had been formed, then employers like [the Motive] defendants . . . "could have their cake and eat it too." ' " (Capitalization omitted.) Put differently, Helfet posits that an employer defendant could either force arbitration if the employer believed it advantageous to do so, or refuse to arbitrate if the employer believed arbitration to be disadvantageous. But were Motive to attempt to avoid enforcement of the arbitration provision based on its own lack of signature, the reasoning which allows it to enforce the agreement would also prevent it from rejecting the agreement.

In arguing to the contrary, Helfet relies on *Marcus, supra,* 68 Cal.App.4th 83, and *Romo, supra,* 87 Cal.App.4th 1153. But the courts in these cases were interpreting language materially different from that on which Helfet relies here. The facts and reasoning of these cases distinguish them from this case in other respects as well.

*Marcus* involved a real estate purchase contract resulting from several offers and counteroffers passing back and forth between the buyers and sellers. (*Marcus, supra*, 68 Cal.App.4th at pp. 85, 89.) The initial offer from the buyers included a provision requiring arbitration that, in part, read as follows: " 'Notice: By initialing in the space below you are agreeing to have any dispute arising out of the matters included in the 'Arbitration of Disputes' provision decided by neutral arbitration as provided by California law and you are giving up any rights you might possess to have the dispute litigated in court or jury trial. By initialing in the space below you are giving up your judicial rights to discovery and appeal . . . . Your agreement to this arbitration provision is voluntary. [¶] We have read and understand the foregoing and agree to submit disputes arising out of the matters included in the "Arbitration of Disputes" provision to neutral arbitration. [¶] 'Buyer's Initials /s/___ Seller's Initials___.' " (*Id*. at p. 86.) "[A]lthough the buyers initialed the arbitration clause as part of their offer to purchase the property, the sellers never initialed this provision or otherwise indicated they accepted this provision in their counteroffers." (*Id*. at p. 89.) The buyers later sought to compel arbitration based on the arbitration provision that they, but not the sellers, had initialed. The court first analyzed the situation by "[a]pplying general California contract law" principles

10

regarding the legal effect of counteroffers, and concluded "the buyers [had] offered to include the arbitration provision as part of the purchase agreement" (italics omitted)—via the initialed arbitration provision in their offer—but that "the sellers did not accept that offer," because they did not initial the arbitration provision in any counter offers, despite the arbitration clause requiring initials of all parties. (*Ibid.*) The Court of Appeal in *Marcus* noted that "[t]he terms of an offer must be ' "met exactly, precisely and unequivocally for its acceptance to result in the formation of a binding contract . . . ; and a qualified acceptance amounts to a new proposal or counteroffer putting an end to the original offer. . . . " ' [Citations.] [Because] [n]one of the subsequent counteroffers between the buyer and seller mentioned the arbitration provision[,] . . . 'buyer, seller and agent' did not agree to submit controversies to binding arbitration, as the arbitration clause require[d]." (*Ibid.*, capitalization & italics omitted.)

As a preliminary matter, we do not consider the *Marcus* arbitration provision to be similar to the language on which Helfet seeks to rely. The contract in *Marcus* included and expressly referenced a space for the parties to initial and thereby signify their acceptance of the arbitration provision, separate from their agreeing to other provisions in the purchase contract. And the language of the arbitration provision described the initials of all parties in this space as *creating* an agreement to arbitrate that otherwise would not be part of the purchase contract. This is in stark contrast with language that, as discussed above, we interpret as stating the company's signature confirms a commitment to arbitration already expressed in absolute terms.

11

It is also significant that, in *Marcus*, the parties could reject the proposed arbitration provision, yet agree to the purchase contract in other respects. The purchase contract described the arbitration provision as a "voluntary" potential add-on to the contract. Here, by contrast, Motive required Helfet to accept the agreement without change as a condition of employment. This is significant, because if the parties can only agree to all the provisions in the agreement or nothing at all, conduct suggesting that the agreement between the parties is operative necessarily implies both parties consented to all the provisions contained therein. And here, the parties' conduct overwhelmingly signifies an operative agreement between Motive and Helfet: namely, Motive employed Helfet, and executing the agreement was a prerequisite to Motive employing Helfet.[4] (See *Banner, supra*, 62 Cal.App.4th at p. 361 [discussing cases in which parties had ratified unsigned agreements by repeatedly acknowledging their validity].)

Although the second case Helfet relies on, *Romo, supra*, 87 Cal.App.4th 1153, involved an employment relationship, it is nonetheless distinguishable. The arbitration provision in *Romo* was one of numerous sections in a 44-page employee handbook. (*Id.* at p. 1155.) The section was "titled 'mutual agreement to arbitrate claims' " and provided that "the company and the employee hereby consent to the resolution by arbitration of all claims or controversies for which a court otherwise would be authorized by law to grant relief." (*Ibid.*, capitalization omitted.) The final page of this section "contain[ed] lines for dates and

---

[4] Of course, it is undisputed that Helfet executed the agreement by signing it. Motive's conduct thus need only support that it agreed.

12

signatures of the employee and the employer." (*Id.* at p. 1156.) In addition, at the end of the entire handbook, under "an unnumbered heading titled 'employee acknowledgment' . . . [was] a place for date and signature by the employee" (underscoring omitted) and the following language:  " 'I acknowledge receipt of my copy of the handbook . . . .  I have read and understood its contents, including company policies and rules governing my conduct, wages and working conditions as an employee.  I understand that this handbook supersedes and replaces any prior company handbook.  I agree to abide by these policies and rules during my employment, and understand the consequences if I do not.' " (*Ibid.*, capitalization omitted.)  The employee had signed this acknowledgment, but neither party had signed the arbitration agreement section signature page.  The court concluded, "based upon the disparate language between [the arbitration] section . . . and the remaining portions of the employee handbook" that "the employee handbook contain[ed] two separate and severable agreements:  (1) the agreement to arbitrate which is the subject of [one section in the handbook]; and (2) an agreement to be bound by the 'benefits,' 'policies,' 'rules' and 'procedures' contained within the remaining sections of the employee handbook." (*Id.* at p. 1159.)  Because the employee had not signed the separate arbitration agreement, there could be no agreement to arbitrate.

The language in the arbitration section in *Romo* is materially different from that at issue here, because, like the language in *Marcus*, it describes that section as creating an agreement to arbitrate between the parties.  As noted, the arbitration provision here does not condition Motive's agreement on a signature—rather, it refers to Motive's

commitment to arbitrating employee disputes, and refers to a Motive representative's signature as "confirming" that commitment. Moreover, *Romo* also did not have occasion to consider the situation presented by this appeal: namely, the significance of an *employer* failing to sign an arbitration provision *the employer prepared and presented* to an employee. In *Romo*, the issue presented was the lack of the *employee*'s signature. Helfet's efforts to treat this fact as insignificant are unpersuasive.

For these reasons, we conclude the court erred in finding Motive had failed to prove the existence of an arbitration agreement between them and Helfet. We therefore turn to the court's alternative conclusion that any such agreement was unconscionable and unenforceable.

## B. *Unconscionability and Severance Issues*

A court may properly deny a motion to compel arbitration despite the existence of an arbitration agreement when the party seeking to avoid arbitration establishes that the agreement is unconscionable. (See *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*); see also *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413 ["[i]f the party opposing the petition [to compel arbitration] raises a defense to [its] enforcement . . . [citation] . . . that party bears the burden [of proof]"].) "Unconscionability ' " 'refers to " 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' " [Citation.] As that formulation implicitly recognizes, the doctrine of unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to

14

unequal bargaining power, the latter on overly harsh or one-sided results.' " ' (*Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1243 . . . (*Baltazar*).)" (*Nguyen v. Applied Medical Resources Corp.* (2016) 4 Cal.App.5th 232, 246 (*Nguyen*).) "Both procedural and substantive unconscionability must be present for the court to refuse to enforce a contract under the doctrine of unconscionability, although ' "they need not be present in the same degree." ' *(Baltazar, supra*, 62 Cal.4th at p. 1243.)" (*Nguyen, supra*, at p. 247.)

Motive concedes, as it must, that the agreement is a contract of adhesion and thus necessarily includes at least a low level of procedural unconscionability. (See *Sanchez v. Carmax Auto Superstores California, LLC* (2014) 224 Cal.App.4th 398, 403.) They argue, however, that the court erred in concluding (1) that the injunctive relief exception was substantively unconscionable, and (2) that the fee-shifting provision, which they acknowledge is substantively unconscionable, could not be severed from the agreement. We address each point below.

### 1. *The Injunctive Relief Exception Was Not Unconscionable*

The court concluded, and Helfet argues on appeal, that the injunctive relief exception reflects a substantively unconscionable carveout to the arbitration provision, because it is "one-sided and meant to benefit solely [Motive]." Where, as here, there is no factual dispute affecting the question of unconscionability, the trial court's unconscionability determination is a question of law subject to de novo review. (See *Farrar v. Direct Commerce, Inc.* (2017) 9 Cal.App.5th 1257, 1265.)

15

By its own terms, the exception is indeed one-sided in favor of Motive, as it permits injunctive relief only for breaches by Helfet of certain provisions protecting only Motive.  But a contract " ' "can provide a 'margin of safety' that gives the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need without being unconscionable." ' " (*Baltazar, supra,* 62 Cal.4th at p. 1250; see also Civ. Code, § 1670.5, subd. (b) ["[w]hen it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination"].)  Therefore, "provisions that allow employers to seek a preliminary injunction outside of arbitration for breach of a confidentiality agreement are not, by themselves, unconscionable, simply because they primarily benefit employers." (*Alberto v. Cambrian Homecare* (2023) 91 Cal.App.5th 482, 492; *Lange v. Monster Energy Co.* (2020) 46 Cal.App.5th 436, 450 (*Lange*) [lack of mutuality in carve-out allowing employer to seek preliminary injunctive relief did not alone render the provision unconscionable; accord, *Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 250 (*Carbajal*).)

Such a provision may be unconscionable, however, if it contains additional terms that "exceed the legitimate 'margin of safety' for the employer." (*Alberto, supra*, 91 Cal.App.5th at p. 492; accord, *Lange, supra,* 46 Cal.App.5th at p. 451.)  Thus, an exception to an arbitration agreement " 'is substantively unconscionable when it authorizes the stronger party to obtain injunctive relief *without establishing all of the essential*

16

*elements for the issuance of an injunction.' "* (*Alberto, supra,* at p. 492, italics added; *Lange, supra*, 46 Cal.App.5th at p. 451.)

In *Lange, supra*, 46 Cal.App.5th 436, this court concluded the lack of mutuality in an injunctive relief carveout to an arbitration agreement was not unconscionable where the agreement identified a " 'reasonable justification for [the carveout's] lack of mutuality' [namely,] . . . protecting [the employer's] 'confidential and proprietary information.' " (*Id.* at p. 450.) Specifically, the agreement stated the employer " 'enjoy[ed] a competitive advantage as a result of its compilation, possession[,] and use of the proprietary information, and that [the employer] would suffer competitive harm if the proprietary information became known to others outside the company.' " (*Ibid.*, capitalization omitted.) The court, however, went on to conclude that other provisions rendered the carveout unconscionable; namely, the provisions permitting the employer to obtain injunctive relief without " 'establishing all of the essential elements for the issuance of an injunction' "—that is, without posting a bond or establishing irreparable harm— something for which the employer had identified "no legitimate commercial need." (*Id.* at p. 451.)

The arbitration provision here describes a justification for its injunctive relief exception similar to that in *Lange*: that "a breach or violation by [Helfet] [of certain provisions protecting Motive's intellectual property rights] . . . will cause immediate and irreparable damage to the company which cannot be easily . . . quantified" and "[f]or that reason," includes the injunctive relief exception. (Capitalization omitted.) We conclude that here, as in *Lange*, this is a legitimate commercial justification. Therefore, the lack of mutuality does not render

17

the exception unconscionable. Nor has Helfet argued that the exception relieves Motive of any requirements for obtaining an injunction. Given the arguments raised by the parties, and in light of our decision in *Lange* and the cases on which it relies, the court abused its discretion in concluding the injunctive relief exception was unconscionable.

**2.** ***The Court Abused Its Discretion in Declining to Sever the Fee-Shifting Provision***

Motive concedes that the trial court correctly concluded the cost-sharing provision is unconscionable "in that, at the time of execution, [it] created the risk that the employee would be required to pay costs prohibited by [California Supreme Court case law]"—namely, arbitration forum costs, or expenses the employee would not be required to bear if the employee brought the action in court. (*McManus v. CIBC World Markets Corp.* (2003) 109 Cal.App.4th 76, 102 (*McManus*), citing *Armendariz, supra*, 24 Cal.4th at pp. 107–115 & *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1080–1081.) They argue, however, that the court reversibly erred in declining to sever the provisions it concluded were unconscionable, including the fee-shifting provision, and that we should reverse the order denying their motion to compel arbitration on this basis.

Whether to sever an unconscionable provision in a contract is a matter within the discretion of the court. (See Civ. Code, § 1670.5, subd. (a).) Although "the statute appears to give a trial court some discretion as to whether to sever or restrict the unconscionable provision or whether to refuse to enforce the entire agreement[,] . . . it also appears to contemplate the latter course only when an agreement is 'permeated' by

18

unconscionability." (*Armendariz, supra*, 24 Cal.4th at p. 122; see *Roman v. Superior Court* (2009) 172 Cal.App.4th 1462, 1477-1478 ["the strong legislative and judicial preference is to sever the offending term and enforce the balance of the agreement"].) This occurs where "the central purpose of the contract is tainted with illegality" rather than "the illegality [being] collateral to the main purpose of the contract." (*Armendariz, supra*, 24 Cal.4th at p. 124.) In considering whether an agreement is permeated by unconscionability, courts take into consideration the extent to which the court would need to effectively rewrite a portion of the parties' contract, as well as the number of unconscionable provisions. (*Id.* at pp. 124–125.)

Applying these considerations, the fee-shifting provision is severable. "[W]ith the exception of the [fee-shifting] provision, the arbitration agreement[ ] [was] otherwise enforceable . . . [and] [is] not so 'permeated' with unconscionable provisions that it cannot be saved. (*Armendariz, supra*, 24 Cal.4th at pp. 122–125; [Citation].)" (*McManus, supra*, 109 Cal.App.4th at pp. 101–102; see *ibid.* [concluding on this basis that an "unconscionable provision requiring payment of . . . [costs] can be severed."].) The court need not revise the agreement after striking the offending fee-shifting provision. Rather, the court can simply excise it, leaving to the arbitrator the question of whether and to whom to award attorney's fees—precisely what the arbitrator would have done, had the agreement not included any provision regarding attorney's fees to begin with. Nor was "[t]he main purpose of the arbitration [provision] . . . to regulate costs [and fees], but [rather] to provide a mechanism to resolve disputes. [Citation.] Because the [fee-shifting] provision is collateral to that purpose, severance was available." (*Gutierrez v. Autowest, Inc.* (2003)

19

114 Cal.App.4th 77, 92 (*Gutierrez*).) The court thus reversibly erred in declining to sever the fee-splitting provision and compel arbitration.[5] (See, e.g., *Nguyen, supra*, 4 Cal.App.5th at pp. 255-256 [where "[a]bsent the fee-splitting provision, . . . no other possibly substantively unconscionable provision in the arbitration clause," provision severable]; accord, *McManus, supra*, 109 Cal.App.4th at pp. 101–102 [provision requiring sharing of arbitration hearing fees].)

---

[5] Admittedly, "a single unconscionable term could justify a refusal to enforce an arbitration agreement if it were drafted in bad faith" (*Gutierrez, supra,* 114 Cal.App.4th at p. 93; see *Armendariz, supra*, 24 Cal.4th at pp. 124–125, fn. 13), and the trial court never had occasion to consider whether the fee-shifting provision *alone* was severable. We need not instruct the court to perform this analysis following remand, however, because there is no evidence in the record, based on which the court could conclude that the fee-shifting provision was included in bad faith. We may therefore, in the first instance on appeal, decide that the provision is severable.

## DISPOSITION

The order is reversed.  Following remand, the court shall enter a new order striking the fee-shifting provision from the agreement and granting the motion to compel arbitration.

Appellants are awarded their costs on appeal.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

BENDIX, J.

WEINGART, J.

21